## RUFUS DWINEL *versus* TIMOTHY BARNARD & al.

If one person had acquired a lawful right to float his logs over the land of another, without his consent, through an artificial channel made by the latter, and is resisted and obstructed in the use of it, by the owner of the land, and makes a contract with him to pay a sum of money for the removal of such obstruction, and for the permission to float his logs, such contract is unlawful and void.

Should a person obstruct the flow of the waters of a river or stream over their accustomed bed, so that they could not be used as formerly, for the purposes of boating, or floating rafts or logs, and should turn them into a new channel, he would thereby authorize the public to make use of them in the new channel, as they had been accustomed to use them in their former channel.

But if a person without right should open a sluice or channel on his own land, and thereby divert the waters of a stream, river, or lake, from their natural and accustomed course, without causing any obstruction elsewhere, the public would not thereby become entitled to their use over his land. They would not be entitled to enter upon his land, and to use the waters in his canal, channel, or sluice, made perhaps for the purpose of operating valuable machinery, because some other person had obstructed the flow and egress of the waters, from a distant point of such stream, river, or lake.

Although the law may not require the lapse of any particular time, to authorize the inference of a dedication to the public for use, there must be evidence, that the owner offered it and designed to do so, for public or common use.

To establish a toll, the channel, way, passage, or other easement, must be exposed and offered for the use of all, who may have occasion to use it, for a settled and established compensation. It must have become such a common channel, way or passage by the consent or act of the owner, that he cannot maintain trespass against any person, who may use it, paying the established toll.

REPORT of the trial before SHEPLEY J.

" This is an action of assumpsit on a contract signed by the defendants, dated May 4th, 1846, which is to be copied.

" It appeared in proof, or was admitted, that before the year 1846, a dam had been built at the outlet of a lake, called by the parties Chamberlain lake; that the waters which formerly flowed from the Allegash stream passed into that lake, and that the waters passed out of the lake at that outlet before the dam was built and onward to the river St. John, and that logs could be run from above the lake through such waters into

Dwinel *v.* Barnard.

the St. Johns river ; that a cut or channel had been made through a part of the township named in the contract by which the waters being obstructed by the dam before named were turned from their natural channel and caused to run through such " cut" or channel into the waters connected with the Penobscot river, so that the logs could be run from the above lake into the Penobscot river, which formerly could be run only into the St. John or its waters.

" The defendants and several other persons, caused logs to be cut and hauled into the waters above the lake during the winter of 1845-6, with the expectation and design of floating them through the waters before named into the Penobscot river. There being several millions of lumber prepared for such purpose, the plaintiff apprehending that it was the design of the owners to float them through that cut or channel, made on his land, without making any agreement with him to pay any toll or compensation therefor, employed about fifty men and sent them up to that cut or channel, with directions to obstruct the outlet thereof and to prevent it, unless a contract was made to pay him therefor, and with directions that if any attempt was made to run the logs through by force, to prevent by force its accomplishment. The logs of the defendants, on the arrival of the men there, were found in the waters above and approaching the cut and were the first (except those of the plaintiff) which were to pass it. Notice was given that their logs could not be passed through it unless they signed the contract above named, and they thereupon signed it, and their logs were passed through. The men sent up were there detained some days after the defendant's logs were passed through to prevent other persons' logs from being passed through, without coming to some agreement to make compensation therefor.

" The grounds of defence will be perceived by the brief statement ; and it was contended that if the defendants were liable on the contract, that they were not liable to pay any portion of the wages and support of the men after they had signed the contract. These being matters which were considered proper for the decision of the Court, the case was by

consent taken from the jury, and is submitted to the Court to decide, whether the defendants are liable on their contract to pay the plaintiff, and to what extent they are liable, and a default or a nonsuit is to be entered according as the rights of the parties, may require. If a default be entered, the damages are to be assessed by a jury, if the parties do not agree upon any other mode of ascertaining them."

A map of the country was introduced, and may be referred to.

Copy of the contract referred to in the report.

"Memorandum of an agreement made this 4th day of May, A. D. 1846.

"In consideration of permission granted to us by Rufus Dwinel of the city of Bangor, proprietor of township No. 6, Range 11, to run through his cut in said township from Telos lake to Webster pond a certain lot or lots of logs, cut by us during the past season, scaling about 800 M. feet, we hereby agree and promise to pay said Dwinel for each and every thousand feet logs which shall pass through said cut the present season the sum of two shillings per thousand feet, and promise further to pay one half of all expenses incurred by said Dwinel in bringing up to said cut from Bangor, about fifty men, to protect and guard said cut, and all expenses in connection therewith, and to pay or satisfactorily secure the same in thirty days after said logs shall have been driven to Penobscot boom.

"Telos, May 4, 1846.                "Timothy Barnard,
"Witness, Tho's F. Myln."          "S. L. Hunt.

Copy of the brief statement of defendants.

"And for brief statement, the defendants say, that the contract declared on and on which this suit is founded was wrongfully and illegally obtained by the plaintiff. The defendants say further, that at the time said contract was executed they were floating their logs on the public and navigable waters of this State for boats, logs, rafts and other lumber from Lake Telos to Penobscot pond, or Webster pond; that their logs

had been put into the Allegash waters, or the Allegash river, a public river of this State, and navigable for boats, logs, rafts and other lumber, and were floating the same from the place they were cut on the waters of the Allegash to said Penobscot pond or Webster pond; that they were met on the way near the entrance of the sluice which leads from Telos lake to said Penobscot or Webster pond, by a large number of armed men, armed and sent up to said sluice by the plaintiff, who then and there threatened the defendants with force and violence, if they attempted to enter said sluice unless they first signed the contract aforesaid; that regarding the great loss of property to them consequent on a failure to come through said sluice and bring their lumber into a place of safety they signed said contract. And they say that the Allegash river in its natural channel flows east into the St. John's waters, but that the plaintiff or those under whom he claims, in 1841, turned the whole current of said river to flow west into the lake Telos and through said sluice into said Penobscot or Webster pond; and that without turning said Allegash said sluice would be of no use; that said plaintiff or those under whom he claims have since 1841 used said sluice and the public have used it for rafting and floating logs and other lumber. And the defendants say, that being on the waters of said Allegash they have a right to float their logs on the same in the current of said river, whether it flowed in its natural channel or an artificial one made without the authority of the Legislature of this State. The defendants further say, that they were floating their logs through Telos lake to Penobscot pond or Webster pond, under the belief and expectation, that they should come through said sluice without hindrance or resistance from any one by paying, or agreeing to pay a reasonable sum per thousand, and that they formed such belief and expectation from the plaintiff's own conduct and declarations before they went up to drive said logs, and that they were met at said sluice by a large number of men armed and sent there by plaintiff to prevent them from coming through said sluice, unless they first signed said contract; that they

Dwinel *v.* Barnard.

were compelled to sign said contract to secure their lumber from danger and bring it to a place of safety.

"The defendants say further, that said contract was extorted by means of fear, at said sluice, and through the anxiety of the defendants to save their property.

" "They declare said contract to be unconscionable, and the claim made under it."

*Rowe*, in his argument for the plaintiff, said that this action was brought upon a contract of the defendants, and for a sufficient consideration. That consideration was the privilege of passing their logs over the land of the defendant, so that thereby, they might have the benefit of the Penobscot river market, far better than the St. John would have been.

If any other person stopped the passage into the waters, which might otherwise have afforded a much more distant and far inferior market, that has nothing to do with the present question. The case does not show by whom that obstruction was caused. It is enough, that it was not caused by the plaintiff, or any one under whom he claims. In point of fact, it was caused by the very persons of whom the defendants purchased their logs, well knowing, that after paying the small sum charged by the plaintiff towards his expenses in making the channel, their logs would be doubled in value.

No injury was done by the plaintiff in opening this communication between the waters of lake Telos and the Penobscot river. It did not destroy or abridge any right before existing, but merely gave new facilities to the owners of timber in making sale of it.

The only question in the case seems to be, how much shall the plaintiff recover; and this depends upon the construction to be given to that part of the contract relating to the payment of the men.

*Ingersoll* and *I. Washburn* argued for the defendants.

The points made in defence, are stated in the opinion of the Court. They cited 7 Greenl. 273 ; 5 Pick. 199 ; 2 Fairf. 278 ; 19 Pick. 405 ; 10 Pick. 59 ; 7 Greenl. 134 ; Rev. Stat. chap. 164 ; 10 Mass. R. 65 ; Story's Conf. Laws, § 247 ; 2

Kent, (5th Ed.) 466; 11 Wheat. 298; 2 Fairf. 381; 15 Maine R. 428.

In this case, WHITMAN C. J. was not present at the argument, and took no part in the decision. The opinion of a majority of the Court, SHEPLEY and TENNEY Justices, WELLS J. dissenting, was drawn up by

SHEPLEY J. — This case is presented on a report, which states, that it was proved or admitted, that before the year 1846, a dam had been erected at the outlet of a lake called Chamberlain lake; that the waters of the Allegash stream flowed into that lake and out of it, before the dam was erected at the outlet of that lake, and thence onward to the river St. John; and that logs could be floated by such waters to the river St. John; that the waters being obstructed by that dam, were turned from their natural channel, and caused to run through a " cut" or channel, which had been made through a part of township numbered six, in the eleventh range, into the waters connected with Penobscot river; so that logs could be floated from the waters above the lake, into the Penobscot river.

A map of the country makes a part of the case, and from that it appears, that the lake and streams referred to, are at that place at a great distance from tide waters. Chamberlain lake, on the map, appears to be a large body of water, some fifteen to eighteen miles in length, and from one to two miles in breadth. The Allegash stream appears to connect with the north-westerly end of that lake, and its distinctive waters to be entirely lost in it. The dam, which obstructed the flow of the waters out of that lake, and onward to the river St. John, appears to have been erected at the outlet some three miles south-easterly of the north-westerly end of the lake. From the south-easterly end of Chamberlain lake, there called lake Telos, an artificial " cut" or channel from one to two miles in length appears to have been made, to connect those waters with waters flowing into the Penobscot river. It does not appear, by whom the dam at the outlet of the lake had been

erected, nor who was the owner of the land, upon which it was erected. Or that the plaintiff had at any time any interest in it, or in the land, upon which it stood, or any connexion with it, or control of it. So far as it appears, he was wholly unconnected with it. It does not appear how long before the year 1846, it had been erected. Nor does it appear by whom the " cut" or channel was made, nor when it was made. It is stated in the brief statement filed by the defendants, " that the plaintiff or those under whom he claims, in 1841, turned the whole current of said river, to flow west into lake Telos and through said sluice, into said Penobscot river or Webster pond." The plaintiff was the owner of the land in the year 1846, upon which that " sluice," " cut" or channel had been made.

There is no proof, that the plaintiff or any former owner of township numbered six, had at any time before the year 1846, or before the contract between these parties was made, permitted logs to be floated through the " sluice," or channel; or had ever before that year proposed, that any person should use it for that purpose upon payment of a toll or fixed compensation.

The defendants and other persons had during the winter of 1845 and 6, caused logs to be cut and hauled into the waters above Chamberlain lake, with the expectation and design of floating them through that " cut" or channel into the Penobscot river. The plaintiff, apprehending that such was their design, without making any agreement with him to pay him any toll or compensation therefor, employed about fifty men and sent them to that " cut" with directions to obstruct the outlet of the waters from the lake into the " cut," unless a contract was made with him to make compensation for such use of the " cut." Notice was given to the defendants, that their logs could not be floated through it without making compensation therefor. And on May 4, 1846, a written contract signed by the defendants was made, by which they obtained permission from the plaintiff to make use of that " cut" to float their logs into waters connected with the Penobscot river, upon certain terms therein stated. Upon that written contract this suit has been commenced.

If the defendants had acquired the right to float their logs in the channel made upon the plaintiff's land without his consent, the resistance and obstruction made by the plaintiff to such use of his land was unlawful, and the contract made with him to remove that unlawful obstruction must be considered as procured by duress and therefore invalid.

If on the contrary they had acquired no such right, they would become trespassers by such use of that channel without the consent of the plaintiff; and if they purchased of him a license to do such an act upon his land, a contract made to obtain that license would be a lawful contract. It would also be made for a valuable consideration, for it would impart to the defendants a right, to which they were not before entitled, and it would deprive the plaintiff of a right, to which he was entitled.

To be relieved from the performance of their contract the defendants must show, that they had before acquired a legal right to the use of that channel to float their logs over the plaintiff's land. The acquisition of such a right is asserted upon three separate and distinct grounds.

1. That by the erection of the dam at the outlet of Chamberlain lake and the obstruction of the flow of the waters to the river St. John, and by the opening of a "cut" or channel to permit them to flow into the Penobscot river, all persons entitled to the use of the waters as they formerly flowed, were equally entitled to the use of them, as they flowed on May 4, 1846.

2. That the owners of the land, on which that "cut" or channel was made, by making it and causing the waters to flow through it, dedicated it to the use of the public.

3. That the "cut" or channel was offered to the public for use, upon the payment of a toll, and that the owner having no right to establish a toll without a grant from the Legislature therefor, any citizen might make use of it, without the payment of toll.

1. In the consideration of the first position, it will be assumed, that the defendants had a right to use the waters of

the Allegash stream and of the lakes, to float their logs to a market.

Should a person obstruct the flow of the waters of a river or stream over their accustomed bed, so, that they could not be used as formerly, for the purposes of boating or of floating rafts or logs, and should turn them into a new channel, he would thereby authorize the public to make use of them in the new channel, as they had been accustomed to use them in their former channel.

If such were not the law, the public might be wholly deprived of their use by such wrongful act; for it might be impossible to cause the waters to return, and to flow again over their former bed.

But if a person without right should open a " cut," " sluice" or channel on his own land, and thereby divert the waters of a stream, river, or lake, from their natural and accustomed course, without causing any obstruction elsewhere, the public would not thereby become entitled to their use over his land. They would not be entitled to enter upon his land and to use the waters in his canal, channel, or sluice, made perhaps for the purpose of operating valuable machinery, because some other person had obstructed the flow and egress of the waters from a distant point of such stream, river, or lake. If this were not the law, the person who had opened such channel or sluice, on his own land, could never be relieved of the burden and liability to pay all damages occasioned by it, without repairing the wrong and removing the cause of injury, occasioned by others, as well as that occasioned by himself. This would make him suffer for injuries occasioned by others, for whose conduct he had never become responsible. He might with little expense, be able to fill up or obstruct the channel made by himself, and thus be relieved from all liability to the payment of damages, for making it. But this he could never do, if the public immediately became entitled to its use.

And he might never become lawfully entitled to enter upon the lands of others, and to remove obstructions, occasioned by them at a distant point on such stream, river, or lake ; for no

person could lawfully enter upon the lands of others, to remove such obstruction as a nuisance, who was not injured by its existence.

The person who diverts the waters of a stream, river, or lake, from their natural bed, is held responsible for all damages occasioned by his own acts. But the law does not make him responsible for the acts of others performed at a distant point on the same stream, river or lake. And he can no more be made responsible for them by being obliged to yield to the public the use of his private channel, than he can by an action at law. The injustice of it would be as great and glaring in the one case as in the other.

The application of these principles of law to the facts presented in this case, shows, that the defendants had not acquired a legal right to float their logs over the plaintiff's land without his consent, by reason of the dam and obstruction of the waters at the outlet of the lake and of the opening of the channel across the land of the plaintiff.

The plaintiff did not erect that dam. Did not own the land, upon which it stood. Did not obstruct the natural flow of the waters at that outlet. Cannot be held responsible for acts, which he did not perform or cause to be performed. Cannot be required to make compensation for such unlawful acts of others by allowing the defendants or others to use or enter upon his own lands, any more, than he can be required to do it by an action at law.

The defendants or others injured by the erection of the dam at the outlet of the lake, or by the opening of the channel on the land of the plaintiff, may obtain redress by an action at law to recover damages of those, who have occasioned such injury. Or they may remove the dam and obstruct or fill up the channel as nuisances. The right to abate the channel as a nuisance does not authorize the use of it for the accomplishment of valuable purposes of a very different kind. If a person could in all cases use a channel made and used by another on his own land for the diversion of the waters of a stream or river from their natural bed in the same manner

and for the same purposes, for which he might lawfully use them in the stream itself, the most valuable mills and manufactories might be thereby immediately destroyed.

2. The facts presented are entirely insufficient to prove, that the channel made upon the plaintiff's land had been dedicated to the public for use. It does not appear to have been used by any person for any purpose before the year 1846. The law does not require the lapse of any particular time to authorize the inference of a dedication. But there must be evidence, that the owner offered it and designed to do so for public or common use. There is no testimony tending to prove that the channel on the plaintiff's land was at any time offered for public or common use without compensation.

3. To establish a toll, the channel, way, passage, or other easement, must be exposed and offered for the use of all, who may have occasion to use it, for a settled and established compensation. It must have become such a common channel, way, or passage, by the consent or acts of the owner, that he cannot maintain trespass against any person, who may use it paying the established toll. Even such a use of property and exaction of compensation, is not regarded as illegal by the owner of a wharf. But there is no proof of such an exposition of the channel for public use, at an established price. No proof, that the plaintiff or the former owners of the land, ever offered the use of the channel to all persons disposed to use it, or to any persons, except those, who had caused logs to be cut upon the presumption, that they might in some way be enabled to float them through that channel. No toll, in the sense in which that word is used in the law, has been established or exacted or attempted to be; while compensation has been claimed, and that claim has been enforced for a license to float logs through the channel. In the case of *Wadsworth* v. *Smith*, 2 Fairf. 278, this Court decided, that "a proprietor may open a passage through his land for his own accommodation and may permit others to pass it under an agreement for compensation, which agreement being founded on a valuable consideration, to wit: the injury done to the freehold, may

be enforced at law.    He may improve his watercourse by dams, locks or otherwise, and withhold their use from all, who will not make him a reasonable compensation." Upon the same principles he may make a new watercourse upon his land and withhold its use from all those, who will not make compensation, and authorize its use by those, who will.    And contracts for such use will be lawful and valid.    Those, who may be injured by the opening of such new watercourse, may abate it as a nuisance, or recover damages for that injury in an action at law.    But they cannot become legally entitled to use it, because the owner of the land had no legal right to open it.

It is only by the misapprehension or by the confounding of principles, which distinguish one class of cases from another in some respects similar, that the defendants can be relieved upon the facts presented from the performance of their contract. To relieve them from its performance, the Court should be able to state clearly the principle, upon which their contract was held to be illegal, but no such principle has been presented.

The defendants by their contract, among other stipulations, promised "to pay one half of all expenses incurred by said Dwinel, in bringing up to said cut from Bangor about fifty men to protect and guard said cut, and all expenses in connexion therewith." The report states, that the men were there detained some days after the defendants' logs were passed through, to prevent others' logs from being passed through.    And the Court are by the agreement to determine to what extent, the defendants are by their contract liable to pay those expenses.

It could not have been the intention of the parties to make the defendants liable for the payment of the time and expenses for the support of men, for an indefinite and unlimited time after their own business had been fully completed.

It doubtless was the intention to make them pay one half of all expenses, so long, as it became necessary to watch their operations.    They will not therefore be responsible for any expenses incurred for the compensation or support of the men,

or for their detention after their own logs had been floated through the channel.

The defendants are to be defaulted, and the action is to be continued for the assessment of damages.

The following dissenting opinion was delivered by

WELLS J. — The facts of this case are very imperfectly presented. It does not appear, by whom, nor when the dam obstructing the passage of the water into the river St. John, was erected, nor who was the owner of the land upon which it was erected. Nor does it appear, who made the "cut" or channel on the plaintiff's land, nor when it was done. The case is so bald and barren of those facts, which should be known, to lay the foundation for a decision, that it would be more satisfactory, to have it presented to a jury, to ascertain them.

But there are facts enough to show, that the plaintiff is claiming to himself all the benefit of the dam and the channel. In the contract, upon which the action is based, the channel is called "his cut," and a person must be extremely incredulous, who does not believe that the plaintiff not only claimed the benefit of the "cut" but also of the dam. The "cut" and dam were made for each other, one being useless without the other, and while the plaintiff claims the benefit of the "cut" or channel, he does effectually claim that of the dam. He cannot shield himself upon the ground, that he has nothing to do with the dam, while he is claiming toll for the flow of waters, caused by the dam.

But assuming that he did not make either, and only succeeds to those who did, how does his claim stand? He owned the channel when the contract was made, claimed the right to take toll for its use, and was, therefore, availing himself of the use of the dam. He musters fifty men to maintain his claim, and compels the defendants either to fight their way through, to sacrifice their lumber, or to enter into a contract, the terms of which were dictated altogether by himself. Had he the right so to do?

There was a vast body of water, stopped by the dam, com-

prising Allegash and Chamberlain lakes, and the Allegash river, the outlet of those lakes. The natural flow of these waters was into the St. John, but they were turned by means of the dam and the channel, into the Penobscot river.

1. The first question which arises is, are the waters thus turned from their natural course, public or private? The public may acquire a right of servitude, in streams not considered navigable, at common law, by long user. *Berry* v. *Carle*, 3 Greenl. 269. And fresh water rivers, though in point of property, they are *prima facie* private, yet they may be of public interest, and belong to the people, as public highways. *Spring* v. *Russell*, 7 Greenl. 290 ; *Palmer* v. *Mulligan*, 3 Caines, 307 ; 3 Kent's Com. 27. The magnitude and capacity for public use of our great rivers and lakes, proclaim them as the highways, made by nature, to promote intercourse and commerce among mankind. *The People* v. *Platt*, 17 Johns. R. 195. It is well settled that the public may acquire a servitude in waters, not navigable, at common law. The Allegash is a fresh water river, not affected by the tides. It appears by the case, that it has been used by the public for floating logs, without any interference on the part of those claiming property in it. If the owners of its bed, allow the public to use the waters which flow over it, the right, to do so, is for the time being, equally as available to the defendants, as if it had been secured by a long user. No one questions the public right to use these waters, and it is unnecessary to inquire whether that right is gained by their extent and magnitude and natural fitness for commerce, or by long use, or by dedication on the part of the owners, of their bed to the public.

The waters are unquestionably subject to public use. Both parties have treated them as such, have floated their lumber on them, without any claim or objection made by any one.

2. Has the plaintiff a right to appropriate these waters to his use, and claim compensation from those, who pass through his channel? If the waters are public, he can only have a concurrent use with the citizens generally ; he cannot be entitled to the exclusive use. The waters are not his, and cannot

be made so, by a mere change in their course. It is quite immaterial, whether he produced the change, or it was done by another, so far as the present action extends.

Here is not a case of the appropriation of water, for mills or manufactories, which even in such cases cannot be done, to the detriment of public rights, without the sanction of the Legislature, but an entire change of the outlet of a vast body of water, for the very purpose of turning it through a new channel, to float lumber into the Penobscot, instead of the St. John. The question does not depend upon who has done this act, but upon the right in the *waters* themselves. The *land*, in which the channel is cut, is the property of the plaintiff, but the waters are not. They belong to any one, who may desire to use them, to float lumber. When flowing through the plaintiff's channel, they are still the waters of the Allegash, and the property of the public is not divested. If one should change an arm of the sea, so that it should pass through his land, or should succeed by purchase of the land to one who did, the common law right of navigation would not be taken away, nor would the right depend upon who made the change, but upon the public nature of the waters. A claim to toll, in such a case, would hardly be tolerated on the ground, that the person, claiming it, was not the one, who made the change. Such waters would still be navigable, and it is that quality, which gives the right to their use, notwithstanding the change of location, by whomsoever effected.

A person, who might divert the Kennebec, Penobscot or any other public river, turning it through his own land, could not by such usurpation acquire exclusive control over those waters, and preclude the public, who had a previous right, from following and using them in their new courses. Nor could he by a conveyance to another, assign a right, which he did not possess. If the assignee could be permitted to say that he was not the wrongdoer, and therefore he had a just claim to prohibit any one from passing, the public would be entirely deprived of its property in those rivers.

Supposing the plaintiff had no agency, in erecting the dam, he would not be responsible for its consequences, and if the flow of the water through his channel was any detriment to him, he might cause the dam to be abated as a nuisance. But he does not object to the present course of the water; his conduct indicates that he considers it a valuable right, and is solicitous to secure the profits of it. If it had been made against his wishes, it would have been very easy for him, to have proved an invasion of his property.

How could the defendants be trespassers in passing their lumber through the channel? The water upon which that lumber floated, was theirs in common with all others. The plaintiff had the power to stop its flow there, but did not do it. He must therefore be considered as assenting to it. One has a right to follow his property, of which he has been wrongfully deprived, into the close and possession of another, if he commit no breach of the peace. But here was a continuity of property in the defendants, by means of the existing servitude, from the lakes and the river, through the channel, and it is not apparent, how one can be a trespasser in such a use of his own property.

The owner of land, through which a public river has broken and found a new bed, holds the same relation to the public as did the owner of the land over which it had previously flowed. He cannot claim the whole river as his property, because the waters are not his. Nor are those who use it trespassers. It is said in Angell on Watercourses, 221, " by what was said as to those rivers which are public highways, it will appear, that a river of this kind, by constituting to itself a new channel, may convert a private field into public property ; that is, the new channel becomes public for use and accommodation, and cannot be impeded or obstructed."

This principle is derived from the civil law. "If a river, entirely forsaking its natural channel, hath begun to flow elsewhere, the first channel appertains .to those, who possess the land close to the banks of it, in proportion to the extent of each man's estate next to such banks ; and the new channel

partakes of the nature of the river, and becomes public. And, if after some time the river returns to its former channel the new channel again becomes the property of those who possess the lands contiguous to its banks." Just. Insti. Lib. 2, Title 1, § 23. And this doctrine does not appear to be at variance with that of the common law, but it is believed that it can be clearly inferred from the principles of that law, applicable to public rivers.

If the river has been changed by artificial means, which are still existing, and the owner of the new bed, though he did not cause the change, suffers it to continue, he cannot thereby acquire entire dominion over it. He might as well say in the one case as in the other, that those who have a right to the use of it, should restore it to its ancient channel.

The beneficial use and right is in the waters, and the owner of the substratum, upon which they rest, cannot draw to himself an exclusive property in them.

It is manifest, that there was a concurrent action between those who built the dam, and those who made the channel, and the plaintiff, if he was not one of those, is the owner of the land where the channel was made, and succeeds to the property, in the position in which they placed it; their wrongful acts can confer no right upon him; as they could not acquire the control of the water, he cannot be in any better situation by their misfeasance. If they could not hold the defendants as trespassers, the sale of the land to the plaintiff would not render them such. He took the land with the property of the public, and can acquire no rights superior to theirs.

In *Arundel* v. *McCulloch*, 10 Mass. R. 70, it is said, that no individual can appropriate navigable waters to his own use, or confine or obstruct, so as to impair the passage over them, without authority from the Legislative power.

The same principle must apply to those waters, in which a public easement exists, for floating boats, rafts or logs.

The defendants having a right to follow the waters of the lakes and the Allegash, through the channel made on the

plaintiff's land, the contract, which was entered into by them, is void for want of consideration.

3. The power of taking toll is a part of the sovereignty, and the exercise of it must be derived from the government. A person cannot erect a bridge or make a road, holding them out to public use, and taking toll, without authority from the State. But he may erect a bridge or open a passage through his own land for his own accommodation, and may permit others to pass them under an agreement, for compensation, yet he cannot take a settled or constant toll, even in his own private land. The distinction consists in the dedication, or holding out of the franchise to public use, and in the reception of toll; and in a private use, in which others are allowed to participate for compensation. *Olcott* v. *Banfield*, 4 N. H. R. 537 ; *State* v. *Olcott*, 6 N. H. Rep. 74 ; *Wadsworth* v. *Smith*, 2 Fairf. 278.

The plaintiff, and those under whom he claims, must have contemplated, that the owners of lumber over a vast extent of territory, would be under the necessity of running it through the " cut" or channel to market, and that compensation would be obtained for the transit. The plaintiff claimed a toll of two shillings per thousand feet. Apprehending an attempt would be made to pass through the channel without payment, he sent fifty men with instructions, to prevent by force, the accomplishment of such purpose. The defendants entered into the contract declared on, agreeing to pay the toll demanded, and one-half of the expenses, incurred in the services of the men.

There were several millions of feet of lumber, cut by the defendants and others, lying in the waters, and intended to be passed through the channel, at the time, when the contract was made. Indeed there was no other way to run lumber from the Allegash and its tributary waters, into the Penobscot river, but through it.

He manifestly held the channel out to public use, claiming a toll for it. The defendants offered to pay what the Legislature should establish or the law allow, but the plaintiff would not permit the logs to pass, without an agreement to pay the toll, which he had fixed.

Dwinel v. Barnard.

No doubt any one may make a road over his own land, and erect a gate, and refuse to let persons pass, unless compensation is made for the use of the road. And if the road is really made and intended for his own use, he would have a right to receive compensation for the license. But if the road is made for the use of the public, or one already existing so appropriated, with the intention to derive toll from a public use, such a franchise cannot be established without authority from the government. A partial and limited use by the owner himself, in concurrence with the public, could not alter the real nature of the franchise. So also a person may make a canal and locks to improve the navigation of a private river, for his own use, and receive compensation for the use of them by others, but if the great and paramount object is public and not private use, to obtain tolls or profit from the public, such a course cannot be pursued without a charter from the Legislature.

Unless so plain a distinction is observed, it would be easy for any one, to establish a lucrative franchise, without application to the proper authorities, and numerous evils and impositions would flow from such assumptions, on the part of individuals, claiming such powers, which would be restrained only by their own interest or will. The present case is a fit illustration of the wisdom of the law, in establishing the principle under consideration. The plaintiff causes a band of fifty men, to march many miles, for the purpose of preventing by force of arms, the use of the channel without the payment of a toll, which he has established, thus endangering the public peace, and the lives of those who might enter into the conflict. And the defendants, to save their property, which would have been worthless, unless it could have been got to market, were under the necessity of entering into the contract, prescribed by the plaintiff, not only to pay the toll, but one-half of the expenses incurred by the plaintiff in the alleged employment of his men, to protect and guard the channel; thus swelling his claim to an enormous amount. While there is no evidence of any preparation, on the part of the defendants, to obtain by force, the use of the channel.

This case is submitted to the Court, for its decision, upon the facts, without the intervention of a jury. It is a question of fact, whether the plaintiff held his channel out for public use ; or whether he kept it for private use ; and the public use was but incidental. But the whole bearing of the facts most clearly shows, that the channel was kept for public use. It was evidently intended for the passage of lumber, to be cut on an immense extent of territory, and there is no evidence the plaintiff owned any more than the township, through which it was made. His own lumber must have been of small amount, in comparison with that of all other owners.

At the time when the defendants entered into the contract, there were several other persons' logs passed through the channel, and of whom compensation was claimed, and the men were detained to prevent their passage without some agreement to make compensation.

No length of time is necessary for the continuance of such claim, to render it illegal. The first act of claiming toll, under a franchise, set up without authority, is as objectionable, as a subsequent one. How long prior to 1846 such claims had been made is not exhibited, but there is sufficient evidence, in that year, of those made, to show the extent and purpose of them, and to prove the paramount object to have been to keep the channel for public use.

The plaintiff being prohibited by law, from taking toll under such circumstances, the contract was in violation of law, and cannot lay the foundation of an action.

4. But there is another ground of defence to this action, even if the claim were not in direct violation of the law and prohibited by it. It is true a contract obtained by menace of a trespass to lands or goods, by the common law, is binding, because redress may be obtained, if such injuries be inflicted. Chitty on Con. 55. But in *Chase* v. *Dwinal*, 7 Greenl. 134, the plaintiff recovered back the money, he had paid for boomage of logs, which were not subject to it. As the loss of property would have been very great to him, if he had resorted to an action for damages, or to recover his logs, detained under a

claim, illegally made, he was allowed to recover the money paid, on the ground of extortion, and that the payment was not voluntary.

The contract, which the defendants made, is inoperative for a like reason, the logs not being subject to the demand of the plaintiff. No threat of injury to their property was made, but to save themselves from an impending loss, they signed the contract. The same principle, which would have enabled the defendants to recover back the money, if it had been paid, furnishes a defence to the action.

In my opinion, there are no legal grounds upon which this action can be sustained.