# Munn and Barton *versus* The Mayor, &c., of Pittsburgh.

*Liability of Municipal Corporation to repair Natural Drains or Sewers.*
*—Judgment of Nonsuit, when proper.*

1. A city may connect its sewers and drainage with any natural channel for the flow of water, without incurring liability to keep that channel open to its mouth; and the right or liability is not changed, though the state or the owners of the lot through which it passes have made an artificial and covered substitute, in the place of the natural channel.

2. Where the corporation occasionally made repairs on the sewer substituted for the natural channel, that fact is no evidence of a voluntary assumption of the duty of maintaining it on the part of the city: it is not a case of dedication to public use, whereby the corporation becomes bound to repair by adopting it, so that the making of the repairs becomes evidence of adoption.

3. The corporation is not liable for damages done to lot-owners by the falling in of the old sewer, thus substituted for the natural channel, unless the damage was caused by the negligence of its agents in connecting their sewer with the old one, or in not keeping their own sewer in order, or in bringing into the old sewer such an additional quantity of water as to gorge and break it.

4. Facts are for the jury: the law applicable to them, for the court: therefore, where the court ordered a nonsuit, on the ground that, under the law as applicable to all the facts of the case, that a jury could have found from the evidence, there was no liability on the part of the corporation, defendants; such order does not violate the constitutional right of trial by jury and is not error.

Error to the District Court of *Allegheny county.*

This was an action on the case brought by Munn & Barton, against the City of Pittsburgh and the Pennsylvania Railroad Company, to recover damages for injury to their mill and manufactory, on the corner of Pennsylvania avenue, Boyd and Watson

streets, Eighth Ward, Pittsburgh, by the bursting or falling in of a sewer.

The case was this:—

When the state of Pennsylvania constructed the line of public works from Philadelphia to Pittsburgh, it extended the canal by a tunnel through the hill from Seventh street, Pittsburgh, to the south-eastern line of Pennsylvania avenue, and thence by the bed of what was formerly called Suke's Run, to the Monongahela river; but the tunnel and that part of the canal along Suke's Run was never used for the purpose for which it was made, only one or two boats having passed through it.

To carry off the water of Suke's Run so that it would not affect the canal, a tunnel was constructed alongside of it from near the avenue to the river, of brick, five feet in diameter in the interior or " clear," with a thirteen inch wall or arch around it. This sewer was not made on ground taken from individual owners and paid for by the state, like the canal, but was excavated through private property, and was entirely covered up, so as to leave the ground for use by the owners as before. Near Boyd street it was covered with earth to the depth of about fifteen feet, so as to be level with the surrounding ground. The state does not appear to have paid any attention to this part of the canal and tunnel after their first construction. But the water of Suke's Run continued to flow through it up to 1849 or 1850.

In 1849, the city of Pittsburgh provided for the construction of, and did construct, a tunnel from a point on Pennsylvania avenue, near Washington street (about a third of a mile east of Boyd street), running along under the centre of said avenue, at a moderate descent, to a point opposite said Boyd street. There the new tunnel, by a sharp curve and a rapid descent, was run across the mouth of Boyd street, down to the head of the old tunnel built by the state, and so connected with it, the two thus forming one continuous tunnel from the beginning of the new one by Washington street to the terminus of the old one at the Monongahela river. The point of junction of the two was made under a lot or lots of ground now owned by the plaintiffs by purchase in November 1859. At that point the ground was filled up to the height of about fifteen feet above the upper wall or surface of the new and old tunnel, and left for use by the owners as was usual elsewhere. Along this short curve, by which the junction was effected, the fall or descent is at the rate of about five feet in the hundred, or one foot in twenty feet. Along the other parts of the new tunnel the fall is but two or three inches in ten feet. This curve is about one hundred feet in length, and the deflection or turn-off, from the straight line of the new tunnel, is from fifty to sixty feet in that distance.

[Munn *v.* Mayor, &c., of Pittsburgh.]

The new tunnel was built at an interior diameter of five and a half feet. To make the new and old tunnels correspond in diameter at the point of junction, the new tunnel was contracted from five and a half feet to five feet, which contraction is made along the aforesaid curve.

The water of Suke's Run was carried off by the old sewer before the new sewer was built. The new sewer is not on or near the bed of Suke's Run, but in its whole length from fifty to one hundred feet north of it, pursuing the same general direction. The new sewer drains a larger area than Suke's Run and the old sewer did before the new one was built, a branch of the new sewer being extended to the Court House, on Grant's Hill.

Since the construction of the new sewer the city has repeatedly repaired it when broken in at different places.

There was evidence in the case tending to show that this old sewer was not of sufficient capacity to carry off freely all the water thrown into it by the new one.

Neither the city nor the state ever took for public use, or paid for, the lots Nos. 1 and 2, the property of the plaintiffs in this case, under which these two sewers are joined.

In the fall of 1858, the plaintiffs built on these two lots a large three story brick building for a manufactory of farming implements, boxes, wind-mills, &c., and mill for grinding "feed," and also a "feed store." They put in expensive machinery, and carried on a large business until the month of July 1859, when during a heavy rain, the earth, some fifteen or twenty feet deep over the sewer, fell in, and being carried away by the water, made an excavation about twenty-five or thirty feet in diameter, tearing down a part of the walls of the factory, breaking and destroying machinery and materials, and nearly ruining the building and stopping the work entirely. The damage occasioned to the plaintiffs thereby was about $4000.

It also appeared from the evidence, that the foundation walls of the factory were not placed on the rock on which the sewer was built, but only two or three feet deep; adding the weight of the building to that of the earth, which had previously been thrown upon it. The break occurred wholly in the sewer which had been built by the state, and which was afterwards repaired by the city, to allow the water to pass freely away from the sewer which had been built by authority of councils; for which purpose possession of the site of the factory was taken, and retained until the completion of the work.

The plaintiffs' declaration contained five counts, alleging:

First. That defendants, by the construction of divers sewers, diverted the natural course of the water, and caused the same to flow through plaintiffs' lots, and greatly increased the quantity and volume of the water, and that defendants were bound to

keep said sewers in repair, but failed to do so; and that on the 30th day of June 1859, said sewers broke and damaged plaintiffs' mill.

The second count alleged the construction of the sewers and the duty of defendants to keep them in repair, and their failure to do so, by reason of which the same gave way and fell in, and thereby damaged plaintiffs' mill.

The third count averred that defendants wrongfully caused great bodies of water to be thrown upon plaintiffs' lots, by which their mill was undermined, wrecked, and injured.

The fourth count alleged the construction, by the state of Pennsylvania, of a sewer running through plaintiffs' lots, and that the city of Pittsburgh afterwards constructed another sewer connected with the state sewer, by which large bodies of water which before that time were carried off by other outlets, were thrown into the state sewer, exceeding its capacity, in consequence of which it broke and bursted, and that the plaintiffs' mill was thereby injured.

The fifth count alleged the existence of a sewer through plaintiffs' lots for the mutual use and benefit of defendants, which it was their duty to keep in repair, but that they neglected this, and suffered it to fall into dilapidation and decay, and by reason thereof it broke under plaintiffs' mill and injured it.

Before the case was tried, plaintiffs entered a *nol. pros.* as to the Pennsylvania Railroad Company, and proceeded against the city of Pittsburgh alone, making no change in or amendment of their declaration.

The testimony of the plaintiffs showing only the above stated facts, the defendants requested the court to nonsuit the plaintiffs on the ground that there was no evidence of negligence or misfeasance on the part of the defendants on which a jury could properly base a verdict; which was done, and afterwards, on argument, affirmed by the court in banc. The case was thereupon removed into this court by the plaintiff below, who assigned for error, the entry of judgment of nonsuit; the refusal of the District Court in banc to set aside the nonsuit; the ruling of the court below that plaintiffs had not offered any evidence which entitled them to recover, and the assuming to decide the law and the facts of the case, thus depriving the plaintiffs of their right of trial by jury.

*George F. Gilmore* and *Thomas M. Marshall,* for plaintiffs, argued that the city authorities having voluntarily adopted the old state sewer, for the purpose of conveying a largely increased volume of water to the river, was bound to know its fitness, capacity, and state of preservation before making a permanent connection, which would shut out individuals from investigation, and that not having exercised ordinary and proper care in the

[Munn *v*. Mayor, &c., of Pittsburgh.]

premises, the city was liable for the injury which plaintiffs had sustained: citing The Mayor of Lynn *v*. Turner, Cowper 86; Townsend *v*. Lurgo Turnkpike Road Company, 2 Denio; Schuylkill Nav. Co. *v*. McDonough, 9 Casey 79; Coon *v*. Wood, 10 Barr 93; Goodloe *v*. City of Cincinnati, 4 Ohio 501; Chestnut Hill Turnpike Company *v*. Rutter, 4 S. & R. 7; Erie City *v*. Schungle, 10 Harris 388; Dean *v*. New Milford Township, 5 N. & S. 545; Pittsburgh *v*. Grier, 10 Harris 67; Brown *v*. Lynn, 7 Casey 510.

*J. J. Kuhn* and *J. F. Slagle*, for defendants in error.—The sewer over which plaintiffs erected their factory, was not built by the city, so that plaintiffs have not in their favour the usual and proper argument based on defective materials and improper construction, even if such existed.

Neither was it the duty of the city to keep the state sewer in repair. Suke's Run was the natural channel for carrying away the waters falling between the hills which skirt the Allegheny and Monongahela rivers, which the city would have been entitled to use. The fact that the state covered it with an arch upon which the lot-owner threw ground and erected buildings, cannot render the city liable to keep this arch in repair for ever, so as to protect the buildings erected upon it. The mill is over the channel of Suke's Run; so that if the state had not arched it over, the plaintiffs would have been bound to do so. If any one is liable for this injury, it is the state or the Pennsylvania Railroad Company, which succeeded to the rights of the state.

The jurisdiction exercised over this state sewer by the city, extended no further than to repair it three or four times, when breaches occurring in it had rendered the streets unsafe, and there was not time to await the action of the canal commissioners or the railroad company. Work done under such circumstances is not the voluntary assumption of the perpetual duty of keeping the sewer in repair.

The allegation that the damage was caused by the increased quantity of water thrown into the sewer by the city, is refuted by the fact, clearly proven, that "the sewer did not burst from a gorge of water." The construction of the city sewer could not increase the quantity of water in Suke's Run, whether arched or open.

The city sewer was but three inches smaller than the state sewer, which difference was compensated for by the fall in the latter. Nor did the break occur by reason of the curve spoken of, for the first sinking of the building occurred thirteen feet below the head of the state sewer, four or five feet of which was standing after the hole was cleaned out.

Even if the city was liable to keep the state sewer in repair,

there was no evidence that it broke because it was out of repair. The plaintiffs asked that the jury might infer or guess it, which the court below refused to permit. Beside this, the case shows recklessness and negligence on the part of the plaintiffs, in selecting that site for a large manufactory, with a powerful steam-engine and jarring machinery, and in not sinking their foundation below the arch of the sewer, which was built on rock, and had stood for twenty years unhurt. After the city sewer was built, it stood ten years uninjured, with all its alleged defects; but it broke within four months after the plaintiffs' mill was built over it. Under such circumstances, the case was one in which a judgment of nonsuit was particularly applicable; it was therefore moved for and granted by the court.

The opinion of the court was delivered, October 31st 1861, by STRONG, J.—In this case the District Court, on the trial, ordered a nonsuit to be entered, being of opinion that the plaintiffs had given no such evidence as in law was sufficient to maintain the action. It was an action of trespass upon the case to recover damages alleged to have been sustained by the plaintiffs in consequence of the breaking and falling in of a sewer, by which their mill and manufactory had been thrown down. The fall of the sewer was averred to have been caused by the wrongful act of the defendants, or to have happened in consequence of their negligence. It was alleged, and so the evidence submitted proved, that the broken sewer was not in any highway, or on any land belonging to, or in possession of the defendants, but on a lot of the plaintiffs. It was constructed some thirty years ago by the Commonwealth of Pennsylvania to convey the water of a small creek called "Suke's Run," and to prevent its flowing into the state canal, which in places occupied the bed of the stream. It was a substitute for the run, located near where the old run was, and probably at the place where it broke, in the old channel. Whether this was so or not, it is however immaterial. There was no contradiction in the evidence that it was a substitute for the run, and that the water of the run passed through it. In 1849 the defendants caused another sewer to be constructed along Pennsylvania avenue, in the city of Pittsburgh, to the old sewer constructed by the Commonwealth, formed a connection with it, and thus discharged the water of the avenue and other streets through it into the Monongahela river. The junction of the two sewers is on the lots now owned by the plaintiffs, and they were covered with earth in places to the depth of fifteen feet. In 1858 the plaintiffs became the purchasers of the lot where the state sewer commenced, and through which it passed, and erected their mill directly over it. In July 1859, the old sewer broke under the mill, and as a consequence the

mill itself was injured. Such are the prominent facts of the case as they appeared in evidence. Other facts, which are considered of consequence by the plaintiffs in error, will be noticed hereafter. Now, it is clear that on such a state of facts the action could not be sustained against the defendants unless they were guilty of negligence in not keeping the state sewer in repair, or unless their connection of their own sewer with it was a wrongful act, and the injury was caused by that connection. Whether they were guilty of such negligence depends upon the question whether it was their duty to maintain the state sewer in a safe condition, for if it was not, their omission to do it was no wrong to the plaintiffs. It is not easy to see, however, how it can be maintained that such was their duty. The sewer was not built by them, and it was not upon any lands of which they had the control. It was the property of the Commonwealth, or of the Pennsylvania Railroad Company, to whom the Commonwealth sold, and it was upon ground belonging to private owners, the plaintiffs and others, ground upon which the defendants had no right to enter. It is argued that by connecting their own sewer with it, the defendants adopted it as their own. And again, that inasmuch as it was shown that on several occasions they had made some slight repairs to it, they may be considered as having assumed the obligation to maintain it. The argument loses sight of the fact that the sewer is the substitute for "Suke's Run," is in fact "Suke's Run" itself. Into that run the city had a right to pour its sewers and drains, without being under any obligation to keep it clear to its mouth, on the private property of all the lotholders through which it flowed. This right it could not lose by the fact that the lot-owners, or some one else, had conducted the run through a covered passage-way. Conveying the water of their own sewer into the old state sewer was, therefore, but the exercise of a right burdened by no obligation. It no more imposed upon them the duty to maintain the old sewer than their conducting the water into the run, before the Commonwealth interfered with it, would have compelled them ever after to keep the run clear to its mouth.

Nor can the repairs of the old sewer, occasionally made by the defendants, be regarded as any evidence of their voluntary assumption of the duty of maintaining it. It is conceded that when there has been a dedication of a highway to public use, a municipal corporation may become bound to repair by adopting it, and that making repairs is evidence of adoption. The cases cited by the plaintiffs in error prove this, but they prove no more. In such cases there is not only a right to make the repairs, but they can only be accounted for on the supposition that there exists a liability to make them, and they work an estoppel *in pais* against the owner of the land. They are cases

[Munn *v.* Mayor, &c., of Pittsburgh.]

of dedication. But when the repairs made have been rendered necessary to the enjoyment of a right without any obligation to make them; when a channel, which the corporation may use without any duty to maintain it, has been appropriated and exposed to obstructions, and has thereby become dangerous to the sewerage which the corporation has constructed, it would be going very far to hold that work done to guard against the danger was evidence of obligation to do it. The present is not a case of dedication. The defendants have no right of entry on the private property of the lotholders, for the purpose of repairs, and probably the plaintiffs themselves would stoutly deny their right, if it became necessary to take down the mill in order to keep up the sewer. Under the circumstances of this case the repairs made were no evidence of a duty of the city to maintain the sewer built by the Commonwealth.

Then, was there evidence that the old sewer was broken in consequence of a wrongful connection of the new sewer with it? That the defendants had a right to make a connection, and conduct the water from their sewer into it, we have already said, and we discover no evidence that the mode of connection was negligent or unskilful. It is urged that the diameter of the city sewer was some three inches greater than that of the old, and that it brought into it an additional quantity of water. These facts, it is contended, tended to establish a liability of the defendants for damages resulting from the fall of the old sewer. It was proved, however, and there was no conflict of testimony, that the old sewer would vent more water than the city sewer could bring into it, in consequence of its greater inclination. Nor was there a spark of evidence that it broke in consequence of being gorged with water. The proof was the reverse. Nor was it proved that any injury was or could be sustained by it in consequence of the alleged fact that the city sewer increased the flow of water. This part of the case has not been relied on in the argument, and it could not be. There was no evidence to sustain it. The case here has been rested upon the assumption that it was the duty of the defendants to maintain and keep safe the sewer built by the Commonwealth, a position which we have shown untenable.

The court then was right in holding that there was no evidence sufficient in law to maintain the action, and in directing a nonsuit. The complaint that the constitutional right of trial by jury has been violated is made without due consideration. The province of a jury has always been to determine facts. What is the law applicable to those facts has always been a question for the court. In ordering the nonsuit, the court conceded all the facts which the jury could have found, and simply declared that

[Munn *v.* Mayor, &c., of Pittsburgh.]

under the law as applicable to them there was no liability on the part of the defendants.

The judgment is affirmed.