## Finkbeiner v. Chidsey

*Alfred Nittle,* for plaintiff.

*George F. Coffin, Jr.,* for defendant.

McCLUSKEY, P. J., March 30, 1942.—Motion to take off a compulsory nonsuit.

On a motion for compulsory nonsuit all the facts which a jury could find from the evidence on the record are conceded: Munn et al. v. The Mayor, &c., of Pittsburgh, 40 Pa. 364 (1861); Deemer et al. v. Weaver, Executrix, 324 Pa. 85, 87 (1936); Donze et al. v. Devlin, 329 Pa. 1, 2 (1938). Plaintiff is given the benefit of all favorable intendments and every inference that a jury might draw from the evidence in his favor: Stinson v. Smith et al., 329 Pa. 177, 181 (1938). The credibility of plaintiff's witnesses must be assumed: see Lucas et al. v. Bushko, 314 Pa. 310, 313 (1934). In effect, the motion is a demurrer to the evidence, except that judgment cannot be entered for plaintiff, and defendant is considered as admitting every fact which the evidence tends to prove: Bevan v. The Insurance Company, 9 W. & S. 187 (1844); Miller v. Bealer et ux., 100 Pa. 583, 585 (1882). Otherwise, plaintiff would be deprived of his constitutional right to a trial by jury: see Munn et al. v. The Mayor, &c., of Pittsburgh, supra, p. 371.

In September of 1940, John R. Chidsey, defendant, an alderman in the City of Easton, issued a summons to Fred A. Finkbeiner, plaintiff here, to appear and answer in a plea of trespass vi et armis by A. W. Leidy for damages sustained to his Buick coupe in a collision with Finkbeiner's milk truck. A hearing was held on October 22, 1940, before Alderman Chidsey, at which Finkbeiner appeared with his attorney, Alfred Nittle. After Leidy had given his version of the collision, counsel for Finkbeiner cross-examined Leidy and Leidy admitted that the truck which was registered in Fink-

beiner's name was at the time of the accident being operated by Merle Mabus. Mabus is an employe of Finkbeiner, and the latter was not present at the time and the place of the collision. Having established this fact by the admission of Leidy, Mr. Nittle then made a motion before Alderman Chidsey to dismiss the case on the ground that the action was properly one of trespass on the case and that under the acts of assembly and decided cases the alderman did not have jurisdiction to try and decide the cause on its merits. Counsel attempted to submit the statutory law and the cases for the consideration of the alderman and to instruct him upon the law. At the trial of the present case, Finkbeiner, the plaintiff, testified that at this point Mr. Nittle commenced to read to Alderman Chidsey from the "Eisenberg Case" and that Mr. Chidsey replied, "I know the law in this case. I don't like it and never did. I don't have any jurisdiction in this case." Mabus, Finkbeiner's employe, who had also been present at the alderman's hearing, testified that Alderman Chidsey refused to read the "Eisenberg Case" and said, "I am familiar with the law and I know I have no jurisdiction in this case. I don't like the law. Proceed with your case". Mr. Nittle made some further effort to persuade Alderman Chidsey that he did not have jurisdiction, but Alderman Chidsey remained adamant, saying counsel "could appeal if he did not like it". Mr. Nittle then stated there was no use going on with the hearing, and made no effort to have Finkbeiner and Mabus testify. Alderman Chidsey entered judgment for plaintiff Leidy, which judgment, upon a writ of certiorari, was promptly reversed by the court of common pleas.

The present action is one of trespass by Finkbeiner against the alderman for "wantonly, oppressively, wilfully and maliciously", with knowledge that he was without jurisdiction, entering a judgment in the sum of $21.80. Counsel for plaintiff did not serve the statu-

tory notice upon defendant under the Act of March 21, 1772, I Sm. L. 364, before suing out a writ and instituting suit and at the close of plaintiff's case, upon motion by counsel for defendant, the court granted a compulsory nonsuit.

Counsel for plaintiff has now taken the position that the magistrate, knowing that he did not have jurisdiction, maliciously endeavored to assume jurisdiction and is not entitled to the protection of the Act of 1772.

The Act of March 21, 1772, I Sm. L. 364, which was almost a verbatim transcript of the English statute, 24 George II, c. 44, is a venerable monument in the statutory law of the Commonwealth: 42 PS §1011. At one time or another, it has come up for construction before most of the illustrious judges of our early courts, and it would be idle now to attempt to reconcile the dicta of frowning admonition with which they entered judgment in favor of their erring magistrates and constables. The act affords protection, it was declared, wherever the officer acted honestly although mistakenly: Jones v. Hughes et al., 5 S. & R. 299, 301 (1819). Yet, in a suit against a justice of the peace who had allegedly received money by fraud, it was held that he was entitled to notice: Wise et al. v. Wills, 2 Rawle 208 (1828). It was solemnly stated that, where the justice goes beyond his jurisdiction, he can not assume an official character or claim the privilege provided by the act: Prior v. Craig, 5 S. & R. 44, 46 (1819). But when the case arose, and it arose that very same year and before the very same Judge Gibson, judgment was entered for a justice of the peace who ordered a stranger arrested for traveling on the Sabbath, which was no crime in Pennsylvania, and who directed the warrant to be served on a Sunday, which was totally unauthorized, because counsel for the injured suitor omitted to serve the statutory notice. And it took a very grave dereliction in duty by a constable who had custody of a man under a warrant of arrest and who

had connived in and permitted his escape before the court made good its threats and deprived the culprit of the benefit of the legislation: Lantz v. Lutz, 8 Pa. 405 (1848). The court pointed out that the constable had not acted in the execution of his office, that is, in obedience to the mandate of his warrant, but in open contempt of it: Lantz v. Lutz, supra.

The Act of March 21, 1772, sets forth that no writ shall be sued out against any justice of the peace "for anything by him done in the execution of his office" until after 30 days' written notice is served upon him advising him on the cause of action: Act of March 21, 1772, 1 Sm. L. 364, sec. 1, 42 PS §1011. The third section of the act states categorically that, where the action is founded on any act of the defendant as justice of the peace, unless it is proved upon trial that the statutory notice was given, plaintiff shall not recover any verdict against the justice but that the justice shall recover a verdict and costs: 42 PS §1013.

The statute is not obscure nor are its provisions recondite. Yet over the course of the past century and a half, practitioners have time and again omitted to give the requisite notice before instituting suit. At that unhappy point, it is in the great tradition of legal practice to turn to the preamble of the act and attempt to save the situation with a flourish of eloquence: see Mitchell v. Cowgill, 4 Binn 19 (1811) ; Prior v. Craig, supra, p. 45.

The preamble reads: "Whereas Justices of the Peace may be discouraged in the execution of their office, by vexatious actions brought against them, for or by reason of small and involuntary errors in their proceedings: And whereas it is necessary that they should be (as far as is consistent with justice, and the safety and liberty of the subjects over whom their authority extends) rendered safe in the execution of the said office and trust: And whereas it is also necessary, that the subject should be protected from all wilful and

oppressive abuse of the several laws, committed to the care and execution of the said Justices of the Peace: Be it therefore enacted, . . ."

And the traditional argument runs thus. The preamble sets forth the purpose of the legislature. Therefore, the act must be interpreted to effectuate the legislative intent. Now this intent as set forth in the preamble was to render the magistrates secure in the exercise of their office, but only to a point consistent with the safety and liberty of the citizenry over whom they have authority. The provisions of the act are applicable to magistrates who have committed small and involuntary errors. Justice requires that the protection of the act shall not be accorded to a magistrate who has acted wilfully and oppressively. Such delinquency in office is not within the intendment of the statute, and notice to the justice is unnecessary: Prior v. Craig, supra.

Mr. Nittle has developed his argument in the grand manner of Scott and Rawle. Moreover, the argument appears to have the support of famous dicta. But the actual decisions nullify the authority of the dicta. And, the argument, however cogent it appeared in relation to the facts then before the court, was consistently found in the words of Justice Gibson to be "lacking merit" or "without force": see Prior v. Craig, supra.

In fact, this interpretation of the preamble and the legislative intent is not the only construction possible. It is not in our opinion the most logical construction. The act itself, we think, presents not only the operative words, but more accurately than the preamble, it discloses the intent of the legislature. From the act, it is possible to infer that the legislature proposed to vouchsafe to the justices some measure of security in the execution of their office. To that end, it provided for a period of suspension during which the irascible litigant would have an opportunity to take counsel. The act further granted the magistrate the benefit of a brief statute of limitations. These provisions all look

toward the protection of the magistrate against liti-
gious citizens and vexatious suit. But the legislators
also had in mind the inevitable erring justice. And for
him it provided a warning, a locus poenitentiæ, a period
to reconsider and an opportunity to tender amends.
Now it is toward these provisions of the statute that
the latter part of the preamble is directed. It is an ex-
planation why the legislature did not go further and
considered it unwise to grant complete immunity to
the justices against civil suit for misconduct in office.

When the argument for a personal and discretionary
application of the act was first made, the court at once
sensed its impracticality. It was pointed out, "The stat-
ute supposes some wrong to have been done, some ex-
cess of authority, or want of authority, or of jurisdic-
tion; for where every thing has been done according to
law, the act is useless": Wise et al. v. Wills, supra,
p. 210. Indeed, if the justice acted within the limita-
tions of his jurisdiction, he would not be answerable
for a mere mistake of judgment on the merits: Jones
v. Hughes et al., supra. Again, the court said, the act
". . . does not discriminate between mistake, malice,
or fraud, and I do not see how we can. It provides a
certain rule. If we leave this, the court, or the jury,
must make the rule; and this would result in anything
but a certain or uniform rule": Wise et al. v. Wills,
supra, p. 210. And it was Justice Gibson himself who
proffered the thought that in many instances "it would
be impossible to distinguish errors of the head from
those of the heart", and concluded ". . . its provisions
must of necessity be extended to every case of official
misconduct, made subject of an action": Prior v. Craig,
supra, p. 46.

The statute itself provides the only satisfactory test
of its application: was the act, subject of suit, done by
the magistrate in the execution of his office? That was
the theory under which Justice Gibson, by then chief
justice, refused wisely or not its protection to the con-

stable who had acted in contempt of his warrant: Lantz v. Lutz, supra. That was the theory under which the cases were regularly decided, whatever was said. That was the test which ultimately prevailed over all the dicta concerning wilfulness, malice, and want of jurisdiction.

It has been suggested that in a very close case, where the magistrate has committed a tort or possibly a crime, whether he intended to act in the execution of his office or whether he was engaged in a personal wrong under color of office would be a question for the jury: Jones v. Hughes et al., supra, pp. 301, 302. Where the motive of the magistrate is obscure and it is doubtful that he was acting in the execution of his office, a solution undoubtedly would be to treat the question as a question of fact for the jury. Although the testimony might establish an arbitrary and unjudicial attitude, we find no evidence on the record of personal vengeance or fraudulent intent against Finkbeiner.

In the instant case, there can be no doubt but that the defendant alderman acted in the execution of his office. As a magistrate, he issued a summons to plaintiff. As a magistrate, he undertook to hear testimony. As a magistrate, he entered judgment against Finkbeiner. And the very procedure which counsel originally took, a writ of certiorari, to rectify the misdeed establishes the official character of the alderman's act. Had defendant entered the judgment under a misapprehension as to the law, it is clear that he could not have been answerable to Finkbeiner at all: Jones v. Hughes et al., supra, p. 299; in the absence of fraud or corruption, he would not be liable for a mistaken judgment though aggravated by rudeness and discourtesy: Hanna v. Slevin, 8 Pa. Superior Ct. 509, 511 (1898). And assuming that defendant entered the judgment, knowing he did not have jurisdiction, wilfully, arbitrarily, even with malice, he acted in the execution of his office and was entitled under the stat-

ute to the proper notice: see Killion v. Davis, 1 Phila. 215 (1851).

In the facts of the instant case it is difficult to discover any good reason to conjure with the clear language of the act. If the alderman acted wilfully and oppressively, knowing he did not have jurisdiction, this statute does not preclude redress of the wrong, and counsel would not have jeopardized plaintiff's rights by giving defendant notice of the intended suit. To the contrary, the facts of this case emphasize the wisdom of the statute. Notice given, together with a reversal of the unauthorized judgment, might very well have persuaded defendant to make amends. In that event, all the litigation which ensued would have been avoided. While, on the other hand, had defendant remained obdurate after notice, counsel would have indisputably made his point that this was indeed a case calling for legal reprimand.

And now, March 30, 1942, it is ordered, adjudged, and decreed that the motion to take off nonsuit be denied.