## Cheltenham & Abington Sewerage Co., Appellant, v. P. S. C. et al.

226

Argued March 17, 1932.

Before Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*A. Carson Simpson,* and with him *Francis Shunk Brown* of *Brown and Williams,* and *Frank M. Hunter* of *Hannum, Hunter, Hannum & Hodge,* for appellant. —The dedication of a street does not carry with it a dedication of private sewer pipes laid in it: Oak Cliff Sewerage Company v. Marsalis, 69 S. W. 176; Grafnitz v. Howell, 262 S. W. 515; Boyden v. Walkley, 113 Mich. 609.

*John Fox Weiss,* Counsel for Public Service Commission, and with him *E. Everett Mather, Jr.,* for appellee.

*Samuel H. High,* and with him *Harry S. Ambler, Jr.,* and *David E. Groshens,* for intervening appellee, cited: Matlack v. Callahan, 25 Pa. Superior Ct. 454; Stimson v. Brookline, 197 Mass. 568.

OPINION BY PARKER, J., October 10, 1932:

This case comes to us on an appeal from The Public Service Commission. The Cheltenham & Abington Sewerage Company, organized under the provisions of the General Corporation Act of 1874, as amended by the Act of 1893, P. L. 476, filed tariffs increasing the rates for sanitary sewage service and private storm water drainage service, and creating new charges to municipalities for surface drainage. Complaints were filed with the commission by various individuals and by the Townships of Abington and Cheltenham, Montgomery County. The commission reduced the rates fixed for service through the sanitary systems and with reference to the storm water system held that the sewerage company had failed "to show ownership or possession of these storm water drains so as to justify charges for their use." By a stipulation filed, the scope of the appeal was confined to the legality of the commission's action "insofar as it undertook to find and determine that the storm water systems were not the property of the sewerage company." The prime question involved is whether the appellant was the owner of certain surface drainage or "storm water" sewer systems used in performing a public service.

The questions involved arose out of real estate development enterprises. In 1897, William L. Elkins owned a small tract of land in what was then called Ogontz Park, now Elkins Park, in Cheltenham Township, and Mr. Elkins and P. A. B. Widener owned a larger tract of several hundred acres located in the vicinity of Glenside Station, Abington and Cheltenham Townships. The former is referred to as the Elkins Park district and the latter as the Glenside district.

Elkins and Widener having decided to develop these tracts of land by laying them out in suburban lots for residence purposes, entered into some arrangement for their development, the details of which do not appear, with W. T. B. Roberts, a real estate operator.

The two properties were graded, water courses changed, and streets were laid out, graded, paved, curbed, and provided with sidewalks. Plans for the improvements were then adopted and recorded, according to which lots were sold. Prior to the improvement, there were on the tracts water courses which passed entirely through the premises, and various brooks or spring runs which originated on the acreage and flowed into a larger creek. There were small lakes or ponds, swampy ground, and marsh land which were drained. The water courses were encased in pipe or brick conduits and covered over so that the land, as a whole, had an even grade such as was suitable for the purposes intended.

We will first give our attention to the facts arising out of the construction of the drainage sewer system on the Glenside development. The streets, in their courses, conformed to the natural topography of the land. Brick conduits or tile pipes were laid in the beds of the streams or close by, following closely the routes of the streams. The channels made by nature, after being provided with drain pipe to take care of the water, were filled in, forming the bases of streets or surfaces suitable for buildings and yards of suburban residences. The storm sewers were placed either on the exact course of the original streams, on straightened lines connecting winding parts of the beds, or close by, and with a slight exception where it was necessary to cut across lots were within the lines of streets. At the same time, a separate system of pipes entirely unconnected with the surface drainage system was laid to take care of the sanitary sewage of the buildings to be erected on the development. After the

completion of the paving, sewers, and drains, plans were duly recorded showing size, location, and number of lots.

Between May 8, 1899, and March 18, 1901, Mr. Elkins and Mr. Widener sold and conveyed to Mr. W. T. B. Roberts by three separate deeds the title to the Glenside development. These deeds, in addition to describing the land conveyed, contained a clause conveying the "roads, avenues, streets, woods, improvements, ways, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances," and the "reversions and remainders, rents, issues, and profits thereof." Prior to these conveyances, Elkins and Widener conveyed three parcels of land on the Glenside development describing the land as abutting on certain of the streets of the plot. After the transfer from Elkins and Widener, Roberts proceeded to sell and convey the lots on a more extensive scale. He built more than fifty houses on the tract, attached the houses to the sewer systems, and sold them to various owners. These deeds from Roberts not only described the properties as fronting on certain of the streets, but made reference to the recorded plans of the subdivisions.

On or about August 29, 1900, Roberts secured a charter for a corporation, the expressed purpose of which was "constructing and maintaining sewers, culverts, conduits, and pipes with all necessary inlets and appliances for surface, and under surface and sewage drainage in the Townships of Cheltenham and Abington." Not until 1906 did Mr. Roberts convey to the sewerage corporation any rights which he had or had acquired in and to any sewerage systems on the Glenside development, and in the meantime a large number of lots had been sold in which the premises were described by reference to the recorded plot and the adjoining streets. These facts, as stated by us, have either been found by the commission upon sufficient

competent evidence or are taken from the admissions of the parties. The net result was that the promoters and owners for the mutual advantage of seller and purchaser had provided a system of artificial conduits in place of the natural water courses and furnished facilities to take care of the surface drainage on the improvement, and after so doing, proceeded to sell lots.

These facts, in our opinion, disclose an evident intent upon the part of the promoters to dedicate to public use the storm water system, for the benefit of the township and lot owners.

(1) "A sale of lots by a private owner according to a plan which shows them to be on a street implies a grant or covenant to the purchaser that the streets designated on the plan shall remain open for the use of the lot owner, and operates as a dedication of the street to public use. The rights of lot owners in such a case are founded in the contract of the parties and do not depend upon the acts of municipal authorities. This must be considered as settled law under our decisions": Bell v. Pittsburgh Steel Co., 243 Pa. 83, 87. In Davis v. Kahkwa Park Realty Co., 296 Pa. 281, it was held that the subdivision of a tract of land by the owner and the making of a plan showing a park reservation and the selling of lots according to the plan constituted an irrevocable dedication of the park to public use. Not only did the owner, Roberts, convey lots on the Glenside plans as plotted and recorded, but the Township of Abington by ordinance accepted some of the streets upon which sewers were constructed. The sewers included lateral lines connecting with catch basins on the streets, thereby completing the drainage of the streets. The designation of a street as a boundary in a conveyance of land, whether opened or not, if it be on the land of the grantor is an implied covenant by the grantor that it shall be opened for the use of the grantee as a public way and is a dedica-

tion of that street to public use: Maier v. Walborn, 84 Pa. Superior Ct. 522; Holmes v. Longwill, 89 Pa. Superior Ct. 1; Pittenger v. Boro. of Wilson, 101 Pa. Superior Ct. 381.

It is universally recognized that drainage is an essential to the proper construction of highways with either dirt or permanent surfaces. The construction of the sewers before the streets were paved made the sewer an integral part of the street, and the right to use the surface of the street carried with it the right to use the facilities provided for the purpose, in this case the necessary drainage. While it is true that in open country where land is taken for a highway, the easement acquired by the public is only for the purpose of a way over the surface (McDevitt v. Gas Co., 160 Pa. 367, 373), we are here dealing with land which is in every respect urban and so treated by the parties. The same necessity for drainage, for a water supply, for gas subways, for telegraph and telephones, existed that would be found in any municipality. Both our statutory law and decisions from early days have recognized drainage as an integral part of the street. See Marshall v. Commonwealth, 59 Pa. 455. In Ashcom v. Westmont Boro., 298 Pa. 203, it was held that the power to grade and pave a street carried with it implied authority to do everything necessary, usual or fit for grading and paving, including the providing for an adequate drainage system, in that case a storm sewer. When the streets were dedicated to public use and accepted by the borough, there was no reservation of the storm sewers. In fact, as the commission points out, it is doubtful whether such a reservation would have been good if inserted. See Elliott on Roads and Streets, "4th Ed." Volume 1, Paragraph 163; Bradley v. Spokane & I. E. R. Co., 140 Pac. 688; Moser v. Greenland Hills Realty Co., 300 S. W. 177. There being no evidence of an intention to reserve the storm sewers,

the dedication of the streets to public use carried with it such drainage system.

(2) The closing and changing of the water courses and the construction of the conduits and sewers was a substitution of the artificial water ways for the natural water courses, and the Commonwealth, by its designated agents, the townships, and the property owners under the circumstances here involved, had the same right to use the artificial conduits as they had to pass the surface drainage into natural courses. The principle is clearly set forth in the leading case of Munn v. Mayor, &c., of Pittsburgh, 40 Pa. 364, 370, where Mr. Justice STRONG says: "The argument loses sight of the fact that the sewer is the substitute for 'Suke's Run,' is in fact 'Suke's Run' itself. Into that run the city had a right to pour its sewers and drains, without being under any obligation to keep it clear to its mouth, on the private property of all the lot holders through which it flowed. This right it could not lose by the fact that the lot owners, or some one else, had conducted the run through a covered passage-way." Also see Matlack v. Callahan, 25 Pa. Superior Ct. 454.

Turning our attention more particularly to the rights of the purchasers of lots, we find an additional reason for our conclusion. The principle involved is thus expressed by Mr. Justice WOODWARD in Kauffman v. Griesemer, 26 Pa. 407, 413: "Almost the whole law of water courses is founded on the maxim of the common law, aqua currit et debit currere (ut currere solebat). Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the subservient or inferior tenement for the discharge of all waters which by nature rise in or flow or fall upon the superior." We note, however, that the rights relied upon are not true easements. This is pointed out by Judge KELLER, in the case of Wayne Sewerage Co. v. Fronefield, 76 Pa. Su-

perior Ct. 491, 496. The water descending upon an urban or suburban lot, which is not absorbed, if not interfered with must necessarily find its way to the surface of the public streets, and except insofar as public interests may be involved which would give control to the municipality, the lot owner has an inherent right to have the water so pass. If the water takes its course in the situation created by the promoter of the land development, it would promptly find its way into one of the catch basins, or inlets, to the public sewer. The fact that the lot owner connected directly with the drainage system by a pipe from the eaves of his house to the storm water sewer imposed no additional burden thereon and only tended to promote the public interest by avoiding the flow of water on the surface of the streets. This right to allow the water to flow on the land below exists even though there is an increased flow of water naturally resulting from the erection of buildings and the decrease of an absorbing surface: Matlack v. Callahan, supra (p. 461).

For thirty years, the appellant made no effort to collect charges from the municipality for the use of the storm sewers. It is now asking approximately fifteen thousand dollars per year. The inferences to be drawn therefrom suggest an interpretation of the relationship between the appellant and the public by the sewerage company which is not consistent with an intent to reserve any proprietary interest in the storm sewers. If it was the intent of the parties that the storm sewers should be reserved, why have they not before this time sought compensation from the townships for this service?

The owner of these land improvements closed the natural water courses and substituted covered conduits and pipes to serve a like purpose with full appreciation of the facts that rains and storms would come,

that the descending rain would seek an outlet and the water would pass from a higher to a lower level, and that in the development of towns and cities, each individual lot owner has a right to protect himself from loss or inconvenience from the flow of surface water. (See Bentz v. Armstrong, 8 W. & S. 40; Rielly v. Stephenson, 222 Pa. 252.) Recognizing this situation, the promoters furnished the usual and convenient inlets for such surface water. The only reasonable inference is that they dedicated such drainage systems to the public as an outlet for the rain just as they dedicated the streets, graded, paved, and curbed, as an outlet for the owners. They were not obligated to do either, but apparently for their own profit and as an inducement to the sale of lots, did both. If such was not the purpose, there should have been a reservation in the deeds for the lots and in the dedication of the streets or an equivalent notice.

(3) There was not any evidence that the defendant was furnishing a public service. Up to this point, we have given consideration primarily to the ownership of the facilities. It appearing that the sewerage company did not have any proprietary rights in the conduits, there is left for consideration the question as to whether any other public service has been rendered in connection therewith. It is true that even where private contracts have provided for the furnishing of a free public service, the Commonwealth, acting for the health and welfare of the public and by virtue of its police powers, may require a public service company to render service for which they are entitled to a compensation, notwithstanding the private contracts of the parties. This is illustrated by the case of companies engaged in furnishing sewage service as distinguished from drainage of surface water. While formerly filth, refuse, and foul matter, liquid or solid, was discharged into natural drainage channels, the

public welfare and health demanded that facilities be furnished for the treatment and disposition of such sewage so as to render it innocuous. Consequently, there arose a necessity for a service separate and distinct from the conduits or pipes. In the case of Wayne Sewerage Co. v. Fronefield, 76 Pa. Superior Ct. 491, it was held that, notwithstanding an agreement of the owners of a plot that the lot owners should have free use of the sanitary sewer system, when in the interest of the public health it became necessary to provide a disposal plant to render the sewage innocuous, that such owners could be charged for the service.

The only evidence upon the subject of additional service rendered is the testimony offered by the appellant to the effect that one Mullin, an employee, on several occasions within the last few years cleaned out the inlets. His evidence was that about three or four times a year, after heavy rains, he made a trip around to see if any of the pipes were clogged in the storm water system and that on a number of occasions, when he found it necessary, removed the debris. On the other hand, the township authorities offered evidence to show that they had frequently performed a similar service over a period of years, the testimony being that the highway supervisor of Abington Township for eighteen years had gone through the streets of Glenside every day in his official capacity and as representative of the township, cleaned the inlets, made repairs when necessary, and built new ones. Viewing the testimony in a light most favorable to the appellant, the testimony was not sufficient ''to indicate either a proprietary interest sufficient to sustain a prima facie claim of title or even possession'' or to show such performance of service as would justify compensation to a public service company. The service performed by the appellant was only such as might have been performed occasionally by any one who would be injured

by the clogging of the sewers and might have been done by any property owner, the township, or other persons who would be affected by a heavy rainfall. It is a service that is not sufficient to indicate that it is done as a public service for which compensation may be exacted. In other words, it was a mere voluntary act.

The commission, in its opinion, states: "Moreover, the books of respondent show no expenditures charged to maintenance or repair of the storm sewers." While this finding of fact is made the basis of the nineteenth assignment of error, the statement is practically admitted in appellant's argument and tends to rebut any inference of a furnishing of public service in the matter of drainage.

All that has been said with reference to the Glenside district applies with equal force to the Elkins Park district. The appellant, however, contends that a sale concerning a sewerage plant made by William L. Elkins on December 31, 1900, to William T. B. Roberts, and a transfer of the same date from Roberts to the appellant, shows an intention to reserve the storm sewer. On December 31, 1900, William L. Elkins sold to Roberts "all the right, title, and interest, property claim and demand of him, the said Elkins, in and to all that sewerage plant and system now constructed and owned by him the said Elkins, etc., situated in Ogontz Park," and also two tracts of land containing together about three-fourths of an acre on which the plant was located. It is claimed by the appellant that the conveyance was broad enough to include both the sanitary sewer system and the storm water system. We are unable to agree with this contention. It appears by indisputable evidence that the plant referred to was the sewage disposal plant connected with the sanitary sewer. The conveyance of the sewer is in the singular and there was no connection between the two plants. In Wilkinsburg Boro. v. School District, 298

Pa. 193, it was held that the borough could not file a municipal lien against the school district for the construction of a culvert to cover a creek bed, because the act of assembly under which the work was being done permitted only an assessment for "sewers and sewer connections" and did not give the right to assess for the construction of a culvert over a creek because the power was only to construct sanitary sewers. In that connection, the court said (p. 199) : "In the common sense of the term (a sewer) means a large, and, generally, though not always, underground passage or conduit for fluid and feculent matter, from a house or houses to some other locality, and usually the place of discharge. Other courts have defined a sewer to be a closed or covered water-way for conveying and discharging filth, refuse and foul matter, liquid or solid, while ditches are drains which are, or may be, open and so arranged as to take away surface water." The court also points out that the term "sewer" cannot be construed to mean the same as drainage. It seems apparent that the only property that could have been referred to was the disposal plant and the sanitary sewer connected therewith. It would be doing violence to the plain terms of the agreement to 'add to it another and different system designed for a different purpose. The result is that this conveyance furnishes rather persuasive proof that Mr. Elkins recognized the fact that the storm sewer had been dedicated to public use while the sanitary sewer had not been included.

This leaves for consideration the claim of the appellant that since certain storm sewers were built after the original dedication of the streets, such additional conduits were not dedicated to public use but are facilities the property of the appellant used in public service and for the use of which it is entitled to be compensated. It appears from the evidence that the sewerage company was owned entirely by W. T. B. Roberts,

and he was at the same time owner of such parts of the plot as had not been sold. With this situation existing, the course of Weldon Creek was changed near its source and certain lateral lines added. The change made in the creek was but the substitution of an artificial water-way for a natural one, and the principles to which we have heretofore referred apply. The lateral lines were additions to the main system such as any lot owner or either of the townships would have made for the purpose of taking advantage of the water courses provided by the original system.

In our opinion, the order appealed from is reasonable and in conformity with law.

The order of the Public Service Commission is affirmed, and the appeal dismissed.