Cheltenham and Abington Sewerage Co., Appellant, v. Public Service Commission.

Argued January 31, 1933. Before FRAZER, C. J., KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Frank M. Hunter,* of *Hannum, Hunter, Hannum & Hodge* and *Francis Shunk Brown,* of *Brown & Williams,* for appellant.

*E. Everett Mather, Jr.,* assistant counsel, and *John Fox Weiss,* counsel, for Public Service Commission.

*Samuel H. High* and *Harry S. Ambler, Jr.,* with them *David E. Groshens,* for intervening appellees.

Opinion by Mr. Chief Justice Frazer, March 20, 1933:

The Cheltenham and Abington Sewerage Company has appealed from a judgment of the Superior Court affirming an order of the Public Service Commission sustaining complaints against the company's tariff for sanitary sewerage service and storm water drainage service. By stipulation filed, the only matter presented for consideration by the Superior Court was the legality of the commission's action, in so far as it undertook to find and determine that the storm water systems were not the property of the sewerage company and that rates and charges imposed by the company for service performed by these storm sewers were legally null and void. The appeal before us is confined to the same question.

Appellant's asserted ownership of the storm water lines in question is intimately bound up with the history of the real estate development of the regions in which they are located. This history has been comprehensively stated in the report of the Public Service Commission as well as in the opinion of the Superior Court and need not be repeated here in detail. It is sufficient to say that appellant company was an outgrowth of the real estate enterprises of William L. Elkins and Peter A. B. Widener in association with W. T. B. Roberts, in the districts now known as Glenside and Elkins Park in Montgomery County. Elkins and Widener, in 1897, owned several extensive tracts of land in Cheltenham and Abington Townships which they desired to improve and subdivide for sale to individual owners. To accomplish this purpose they obtained the assistance of Roberts, a real estate operator, who eventually bought out their interests and carried on the project himself.

At the time these tracts were first acquired they consisted to a large degree of marshy lands drained by natural streams. To make the property more readily salable it became necessary to fill in the streams and creeks and to provide artificial conduits to take their place. For this purpose a system of surface water drains was installed which in general followed the lines of the old streams and was intended to be a substitute for them. The land was graded, streets were laid out and lots sold to individual owners. A sanitary sewage disposal system was also built independently of and separate from the storm water drains. In addition, it should be noted there was no connection between the storm water systems in Glenside and Elkins Park.

After his acquisition of the real estate developments, Roberts conveyed his interest in the sewer systems to a corporation set up for that purpose,—the Cheltenham & Abington Sewerage Company, appellant herein. The sale of the system in Elkins Park (then known as Ogontz Park) was accomplished by an assignment endorsed on

the agreement from Elkins to Roberts, dated December 31, 1900, by which the former, in consideration of $3,500 in bonds and $3,500 in stock of appellant corporation, sold to the latter all his "right, title and interest property claim and demand of him the said Elkins in and to all that Sewerage plant and system now constructed and owned by him the said Elkins as situate in, through and under Ogontz Park." Inasmuch as the sanitary sewers and storm water drains consisted of two entirely different and disconnected systems, we are of opinion that the language of the agreement only conveyed to Roberts whatever interest Elkins had in the sanitary sewerage plant and system. Accordingly it becomes unnecessary to consider whether there was a dedication of the storm sewers to the public or other extinguishment of title on the part of appellant between 1900 and 1929, when the sewerage company first attempted to levy a tariff for the use of the surface drainage system.

The record does not indicate in what manner Roberts obtained title to the sewerage system in the Glenside district, unless it was in the deeds for the real estate in that area. These deeds, three in number, executed between May 8, 1899, and March 18, 1901, in addition to describing the land, contained a clause conveying the "improvements, streets, roads, lanes, avenues, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging." It is extremely doubtful if this language can be construed to include the private sewer systems then on the property, but even if it is so interpreted, appellant's case is not assisted materially thereby. On July 5, 1906, Roberts and his wife conveyed to appellant all his right title and interest in "the disposal plant and sewerage system known as the Abington Sewerage Company at Glenside and vicinity." Assuming that Roberts had title to the sanitary sewers and by this deed conveyed his interest to appellant, there is nothing in the language of the in-

strument to indicate it also included the storm water system.

Apart from this fact, we are impelled to the same conclusion reached by the Public Service Commission and the Superior Court from other considerations. The entire process of development of both the Elkins Park and Glenside districts negatives the idea that the promoters intended to reserve a property right in the storm water sewers constructed on the land. On the contrary, it appears that these conduits were installed to take the place of the natural streams which were filled in, and were of primary advantage to the promoters in the sale of the real estate. By substituting encased artificial channels for the natural water courses, the land was made more attractive for building purposes without loss of the drainage. The covering of the creek beds also facilitated the laying out of streets and sidewalks in the development. After lots were sold and homes erected, the streets were dedicated to the public and accepted as such by the township. Roberts and his associates did not furnish a drainage service which had not existed previously. They merely changed the course of the existing channels and enclosed them in conduits. For this act, which was primarily for their own benefit, they are not entitled to compensation at this late date. One who, of his own accord, and for his own purposes, substitutes an artificial channel for a natural channel, cannot charge compensation for the use of the artificial channel: Dwinel v. Barnard, 28 Me. 554; Weatherly v. Meiklejohn, 56 Wis. 73. Furthermore, the property owners as well as the townships have a right to use the artificial conduits for drainage of the surface water which had formerly been carried away in the natural streams: Munn v. Pittsburgh, 40 Pa. 364; Matlack v. Callahan, 25 Pa. Superior Ct. 454.

In addition, there is very little evidence of maintenance by appellant, or other indicia of ownership of the storm water drains, over the period of years which

elapsed between construction of the various portions of the system. The original plan of sewers was not as extensive as it is at present, various additions and changes having been made as the development progressed. The greater part of these additions was made by others than appellant. Much of the construction was done by the Philadelphia & Willow Grove Street Railway in 1904 and 1908 as part payment for the right-of-way granted them; another section was built by Edwin N. Johnson to provide drainage for his own land; a third portion was constructed by Abington Township.

Appellant's evidence of maintenance of the sewers is of the most meager character. It consists chiefly of the testimony of one employee who asserted he made frequent trips to inspect the lines and clean them out when clogged with débris. As stated in the opinion of the Superior Court: "The service performed by the appellant was only such as might have been performed occasionally by anyone who would have been injured by the clogging of the sewers and might have been done by any property owner, the township, or other persons who would be affected by a heavy rainfall. It is a service that is not sufficient to indicate that it is done as a public service for which compensation may be exacted." On the other hand the township has asserted ownership of the sewers continuously since the dedication of the streets to the public and acceptance thereof by the township, and has employed a force of men equipped with proper tools to clean the inlets and make repairs.

Upon consideration of all the factors involved, we are of opinion the sewerage company has failed to make out a case for its ownership of the storm water sewers and consequently it is without authority at law to charge for their use.

The judgment of the Superior Court is affirmed.