Cheltenham & Abington Sewerage Company, Appellant, *v.* Public Service Commission.

Argued November 18, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*George Henry Huft,* for appellant.

*Samuel Graff Miller,* with him *Harry H. Frank, John C. Kelley* and *Richard J. Beamish,* for appellee.

OPINION BY PARKER, J., July 10, 1936:

On December 11, 1934, the Public Service Commis-

sion of this Commonwealth on its own motion instituted a proceeding for the purpose of determining the fairness, reasonableness and justness of the rates, charges and regulations of the Cheltenham and Abington Sewerage Company as contained in its published tariffs. In this capacity we shall refer to the commission as the complainant. The respondent filed an answer denying that its rates were unreasonable, unfair or unjust and averring on the contrary that they were inadequate and less than it was entitled to charge. The rates that had been charged became effective July 1, 1931 under a tariff filed in pursuance of an order of the commission dated October 6, 1930, entered after investigation and hearings wherein the fair value of respondent's property used and useful as a public utility was determined and the annual rate to which it was entitled was fixed. On August 30, 1935 the commission, after hearing, filed its report and order substantially reducing the rate base and annual rate to which the company was entitled and the respondent has appealed to this court.

Prior to 1900 in connection with real estate development enterprises in Cheltenham and Abington Townships, Montgomery County, those who were interested in developing the properties constructed sanitary and storm sewer systems. At the same time, the properties were graded, water courses were changed and streets were laid out, graded and paved. The cost of the construction of the respective sewer systems and the other developments was not segregated so that both in the former hearing and in the present one it was not possible to determine the actual or historic cost of the construction of the sanitary sewer system and it became necessary to depend upon proofs of reproduction costs in order to determine a fair value. In the proceeding before the commission which resulted in its order of October 6, 1930, the valuations and fair returns of both

a sanitary and a storm sewer system were in controversy and it was there held that the respondent was not the owner of the storm sewer system so that rates were fixed involving the sanitary sewer system alone. The order in that case was appealed to this court and affirmed (Cheltenham & Abington Sewerage Co. v. P. S. C., 107 Pa. Superior Ct. 225, 162 A. 469), and like wise affirmed by the Supreme Court (311 Pa. 175, 166 A. 649), but in those appeals the rates fixed for services on account of the sanitary sewer system were not challenged.

As this appeal involves a question of the reasonableness of rates we are required to inquire not only whether the order appealed from is reasonable and in conformity with law, but also to determine whether the findings made and the valuations and rates fixed by the commission are reasonable and proper (Act, June 12, 1931, P. L. 530, 66 PS 836).

We will first consider the elements making up the fair value of the property as a rate base. We summarize the findings of the commission bearing on valuations fixed by the commission as follows:

| | |
|---|---:|
| Reproduction Cost New, Physical Property | $171,264.00 |
| Organization, Engineering, etc. .......... | 21,237.00 |
| Materials and Supplies ................. | 50.00 |
| Working Capital ..................... | 1,000.00 |
| | $193,551.00 |
| Accrued Depreciation .................. | 6,504.00 |
| | $187,047.00 |
| Cost of Financing .................... | 750.00 |
| Going Concern Value .................. | 0.00 |
| Fair Value ..........................: | $187,797.00 |

Reproduction Cost New: The commission fixed the reproduction cost of the plant new, exclusive of over-

head costs and other intangibles at $171,264, of which sum $9,144 was allowed for real estate and rights of way. It is our independent judgment that such valuation is reasonable and just. In fact, the only dispute as to this item concerns an amount of about $1,600, part of the cost of laying six-inch sewer pipe. The language of the engineers was ambiguous, but we incline to the interpretation of the testimony made by the commission.

Organization Expense: For preliminary organization, engineering expense, administration, superintendence, and legal expense and interest during construction, the commission allowed $21,237, or 12.4% of the reproduction cost new of the physical property. The respondent claimed an allowance at the rate of 13%. While the witness supporting the complainant was not as well qualified to express an opinion on this subject from an engineering standpoint as the respondent's witness, a careful perusal of all the testimony convinces us that the finding is supported by the evidence and that the allowance made was liberal. We will therefore not disturb it.

Working Capital: The respondent complains of the allowance of $1,000 for working capital and claims that it is entitled to $3,000. Strictly speaking, materials and supplies necessary to be kept on hand to provide for ordinary repairs and maintenance are part of working capital. Here, however, such supplies are dealt with separately and we are, therefore, now concerned only with cash working capital. A proper amount should include cash sufficient to meet usual operating expenses over such period as would elapse before collections could be made from patrons. We are of the opinion that a company ought not to be held down to the ultimate penny of its proved necessary balance, but there should be a reasonable margin of safety. In the absence of evidence of mismanagement or inefficiency

the experience of the company should have great weight (Brooklyn Boro. Gas Co. v. Prendergast, 16 Fed. (2d) 615, 631). There is no fixed formula by which the proper amount may be determined as the needs vary with different utilities. This company under the findings of the commission has an allowable gross annual income of about $28,000. The bills are collected semiannually in advance, but the experience of the company demonstrates that they are paid over a period of more than a month. Our independent judgment is that there should be an allowance of $2,500 for this item. We believe such an amount is reasonable for a company of the size of the one under consideration, and that under the present banking practice it is doubtful if a bank would be warranted in handling an account of this kind on a balance of a less amount unless a charge was made for its services.

Cost of Financing: The respondent claims $19,354 for cost of financing while the witness supporting the complaint allowed $750 to cover what he described as mechanical costs of a bond issue. The commission adopted the latter view and allowed $750. The respondent's property, as well as a defective title to a storm sewer, was originally acquired by the corporation from the former owner, an individual, in return for $100,000 of first mortgage gold bonds and $100,000 par value of common stock. There was no evidence as to what if any brokerage fees or other expenses had been actually incurred by the corporation in financing any portion of the cost of the property. The respondent contends that since reproduction cost is the basis of the appraisement as adopted by all concerned, under our former decisions, an allowance for brokerage fees and mechanical costs should be made. The complainant contends on the other hand that since no brokerage fees were shown to have been paid the respondent is entitled to an allowance only for what it describes as mechanical

costs such as preparing, printing and registering securities and legal and other expense incident to the issue of such securities.

Cost of financing as ordinarily used would naturally include discount, brokerage fees and costs connected with the issuing of securities such as we have referred to above, but as an element of intangible property which the company is entitled to capitalize and make the basis of a fair return, it does not include discount which is a function of the difference between the interest rate fixed in the obligation and the prevailing rate for money in the market. Interest is not allowable as an operating expense for the respondent is compensated for the use of capital by being allowed a fair return upon the property used and useful as a utility. Our inquiry is therefore directed to this question: There being no evidence of actual payment of a brokerage fee and the proofs being confined to evidence showing the probable cost of securing sufficient capital to reproduce the company's present property, is the respondent entitled to include among its intangible values a theoretical or probable cost of financing by way of brokerage fees? We have two facts which are undisputed and are controlling. The respondent did procure part of its necessary capital by an issue of first mortgage bonds and all parties concerned in fixing the fair value of the property relied upon proofs of reproduction cost without reference to actual or historic cost.

There was a parallel situation in the case of Ben Avon Boro. v. Ohio Valley W. Co., 271 Pa. 346, 356, 114 A. 369, and the Supreme Court answers the contention of the appellee as follows: "The last of the five questions is, Whether or not brokerage, on the sale of the bonds of the water company, should have been allowed? The commission says that sufficient evidence of actual payment thereof was not produced, but everybody knows that expenses are necessarily incurred in

such sales; even our Victory and Liberty Loans could not be marketed except at a very heavy cost. There is no legal principle standing in the way of making a proper allowance therefor, and it is difficult to understand the basis of the mistake of those who hold it should not be allowed. The matter is in the same situation as if appellee had placed its bonds in the hands of an agent, with direction to sell them and apply the proceeds, as needed, for construction expenses. These bonds were all that the water company had to apply in payment of the plant, and the use thereof for this purpose, in the final analysis, constituted simply an exchange of one for the other ....... In order to render innocuous the error made in our prior opinion, that 'brokerage for the sale of its bonds......should properly be considered in connection with the interest charge, and should not be included in the fixed capitalization of the company as the basis of a permanent charge,' we now overrule it. As stated, brokerage is a principal expense, just as it would have been had the labor and materials been paid for in bonds at their market value, as in effect was done."

The contention of the commission that allowance should not be made on account of cost of financing unless there is actual proof of such cost has strong support in the federal jurisdiction: Vincennes Water Supply Co. v. Ind. P. S. C., 34 Fed. (2d) 5; Florida Telephone Corp. v. Florida R. R. Comm., 47 Fed. (2d) 467, 468; Duluth St. Ry. Co. v. R. R. & Warehouse Comm., 4 Fed. (2d) 543, 549; United Fuel Gas Co. v. R. R. Comm. of Ky., 13 Fed. (2d) 510, 520; New York Telephone Co. v. Prendergast, 36 Fed. (2d) 54, 64; Wabash Valley Electric Co. v. Singleton, 1 Fed. Supp. 106, 111; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351. We considered those decisions when in the case of City of Erie v. P. S. C., 96 Pa. Superior Ct. 42, 51, we said: "When evidence of original cost is introduced as

a factor in determining present fair value it is obviously quite proper to consider the actual experience of the company in the matter of the cost of obtaining money and in such cases it has been consistently held that mere theoretical or hypothetical costs of this nature are not to be included. Cost of financing is however an element of value to be considered in a reproduction cost estimate. It is a definite item of cost and by the introduction of the testimony of witnesses familiar with the cost of issuing and marketing securities it should be possible to determine it with substantial accuracy; it may differ materially in different properties and under different plans of financing."

We are in accord with the finding of the commission that $750 should be allowed on account of expenses incident to the preparation and issuing of the bonds and mortgage through which part of the capital was obtained, but are of the opinion that under the decisions just 'cited appellant has shown that it is entitled to capitalize a reasonable sum as a brokerage fee.

What under the evidence offered is a fair brokerage fee? It must be borne in mind that the ultimate problem of both the commission and this court under its broad powers is to fix a return which will be just, fair and reasonable both to the public, the consumers, and to stockholders and bondholders, and it is not of great importance under what particular item a proper allowance is made. The various elements of value, tangible and intangible, which are separately examined in finding a fair value are thus considered in the interest of accuracy, but the individual categories are by no means fixed in their scope. An individual item which the utility is entitled to have capitalized or considered may be assigned more or less arbitrarily to a particular classification. The important matter for consideration is that the utility is entitled to credit for a proper item, but is entitled to such credit only once.

The thought may be clarified by concrete illustrations. An item for interest on investment during construction might be assigned either to cost of financing or placed under the caption of organization expense. Printing or engraving of bonds with the necessary legal expense incident to the issue might properly be allowed under either of these heads. An allowance might also be made for expense of financing by allowing a larger rate of return on the valuation fixed for there is a close relation between these two subjects. The return on capital invested is made as compensation for furnishing the capital necessary to pay for the property involved. It is largely in the discretion of the stockholders whether the entire capital shall be furnished by the sale of common or preferred stock, or by one or by both, or partly by these and by a mortgage bond issue or debentures. Consequently it is sometimes maintained with a good share of reason that cost of financing should be considered and allowed in fixing a rate of return. We have in this state adopted the practice of allowing cost of financing to be capitalized as a separate item, but it is still important to see that the utility is not allowed the same credit twice in a different form. Under our former decisions an allowance must be made on this account and it has not been taken into account in fixing rate of return or under other classification.

These observations have special application to the testimony of the witnesses and the discussions by the commission with regard to the amount to be allowed. The witnesses have fixed the cost of brokerage that would probably be paid as a certain percentage of the fair value of the property which approximates the required capital. If such is the basis of the allowance it is an element to be considered in fixing fair return and not for brokerage fees. Under the authorities it is brokerage and not discount that we are permitted to capitalize and the stockholders are called upon to fur-

nish the necessary capital in one form or another. We are therefore of the opinion that in a rate case brokerage fees as such should be confined strictly to such fees as have been or would be paid to a broker for selling the bonds, debentures or like securities which have a lien preferred to the common stock.

The estimates of the different witnesses vary from nothing to ten per cent of the entire investment. While the witnesses for the respondent have shown superior qualifications to those of the witness called in support of the complaint, there are many inherent errors in all of the testimony and so much speculation that we can give little weight to their conclusions. Consequently we are compelled to depend upon the facts disclosed rather than the conclusions expressed as a percentage. The evidence does show that there are only about a dozen private sewerage companies in the state and of these there is only one comparable in size to the respondent. Investment in sewerage plants is not a well known investment as such plants are usually provided by municipalities. Since they have not the well established investment value of water, gas, electric and transportation companies, it is necessary to employ a broker to make a market for such securities. Investors know that the providing of sewerage facilities is usually a function of a municipality and might well fear that at some time this plant might be rendered valueless by the building of a municipal plant. When we consider the amount of the actual bond issue, we meet a complication which arises by reason of the fact that the financing covered not only the cost of the sanitary sewer system, but also of the storm sewer system. At the same time the bonds are still a preferred obligation on the assets of the company. Giving due consideration to all of the evidence it is our independent judgment that the respondent is entitled to capitalize brokerage fees in the amount of $3,500 in addition to the $750 for mechanical cost of the

issue. The commission very properly suggested in their report that although they felt that nothing should be allowed on this account, if anything was allowed, it should be limited to $3,871. We are not far apart in the result but arrive at the destination by a different route.

Going Concern Value: When the commission in October, 1930, directed the respondent to file its existing tariff, it was so ordered after hearing and after a fair value of the property was fixed and an allowable return determined. In fixing such fair value the commission allowed as part of the intangibles the sum of $12,000 for going concern value. In the present contest the respondent claimed the same amount while it was urged in support of the complaint that no allowance should be made on this account. The commission in its report refused to allow anything saying: "In our judgment, no convincing testimony was presented of record to show a lag of earnings in the early years of operation." In arriving at its conclusion the commission relied on its interpretation of what was said in regard to going concern value in Scranton-Spring Brook Water Service Co. v. P. S. C., 105 Pa. Superior Ct. 203, 220, 160 A. 230, and Chambersburg Gas Co. v. P. S. C., 116 Ibid. 196, 213, 176 A. 794.

Now the burden of proof was here on those objecting to the existing rates to show a change from the situation as it existed in 1930 when the commission found that there was a going concern value of $12,000. Mr. Justice (now Chief Justice) KEPHART, in an exhaustive opinion in Suburban Water Co. v. Oakmont Boro., 268 Pa. 243, 248, 110 A. 778, pointed out in clear language that "when complaints are filed after the thirty-day period, the rates are prima facie reasonable and the burden of proof is on the complainants to prove them unreasonable." It follows with even greater force that when the commission has prescribed rates after fixing fair value and reasonable return, the findings made by the com-

mission as then constituted and unappealed from, may be assumed to be fair, just and reasonable in the absence of proof that there is either a change of factual circumstances, a mistake as to facts previously found or the commission followed an improper course in arriving at its legal conclusions. Such former conclusions are not res adjudicata for the law contemplates by its express terms a re-examination when conditions change, but the burden is on complainants in such case to show facts or circumstances that warrant a different conclusion: Clark's Ferry B. Co. v. P. S. C., 108 Pa. Superior Ct. 49, 165 A. 261 (Allocatur refused by Supreme Court of Pennsylvania and on appeal to Supreme Court of United States affirmed, 291 U. S. 227, 54 S. Ct. 427.) The commission particularly relied on a statement in the Chambersburg case (p. 214) where we said: "It follows that the burden is here on the utility to show that there has been a lag and the amount that should be allowed for going concern value." As applied to the facts of that case, that is a correct state ment of the law. There the utility filed a new schedule and before the effective date of the tariff complaints were filed, and of course the burden was on the utility to sustain its rate which necessitated a determination of fair value with all its elements including going concern value: Suburban Water Co. v. Oakmont Boro., supra, p. 248.

Now to sustain the burden which was on the complainants, testimony was furnished tending to show that the respondent's books did not show whether there had been a lag in the earnings in the early history of the company, and it was urged that the former conclusion was reached through a mistake of law. The reason assigned is wholly inadequate. We thought we had expressed our opinion in definite language in the Chambersburg case when we said (p. 218): "We believe the commission committed its only error of any

consequence in this case in assuming that lag or going concern value could only be shown from the books of the company. We have never so stated the law and such position could not be sustained, particularly when the books by which such facts might be shown have been destroyed." A careful examination of the entire testimony does not show that going concern value could not have been determined from an examination of the books, even if the parties were concluded by such proofs. In fact the contrary appears from testimony which was offered, some of which was stricken from the record. The respondent through witnesses Schmunk and Emerson offered an exhibit (No. 5) which it was testified was gathered from the company's records. This exhibit purported to show the number of customers at the end of each year from 1901 to 1929 and the total collections received for such years. It also contained a statement of the book cost to the company of the plant for each year with an estimate of operating expenses. It is true that the book entries did not attempt to reflect the separate costs of the sanitary and storm sewer systems or separate costs of operation, but sufficient proofs were offered to show that an approximate estimate could have been made of the relative values to be assigned to the respective systems sufficient to show approximately the dates and amounts of the investments and returns at least relatively. Several facts were significant. The exhibit to which we have referred showed the number of customers attached at the end of each year. Referring to a portion of them we find the following: 1902—1; 1905—49; 1906—231; 1911—437; 1915—555; 1920—735; 1925—1298; 1929—1371. The book cost of the plant starting with $100,000 in 1901 and reaching $281,000 at the end of 1929 showed a constant lag in acquiring new customers after increases in the book value. We are not overlooking the fact that there was a change of ownership in the plant

and that the book value would therefore not directly reflect the time when the investments were made, but there was clearly sufficient evidence to show that there was some lag, and that an approximate estimate could have been made of the amount.

We recognize the fact that such proofs as were offered might be a just subject of criticism if such insufficiency were chargeable to the respondent. But notwithstanding the repeated efforts of counsel for the respondent to show an approximate relation between investment and number of customers added, operating expenses and return received, the commissioner who conducted the hearing refused to receive such testimony. While, if the burden of proof were on the respondent to show lag, the testimony which was offered might have been deemed insufficient, it clearly appears that the assertion of the expert called by the commission that the lag could not be determined from the history of the company is not correct. In short, the complainant failed to show that the actual history of the company did not show that there was a lag. We are satisfied that if the respondent had been permitted to do so, it would have been possible to have shown that there was a lag and its approximate amount.

After much discussion, the respondent asked for an adjournment for the purpose of making a more complete estimate than was attempted to be furnished. This was refused by the commission. Under the circumstances, we believe that the case ought not to be further delayed by sending it back for additional testimony on the subject of going concern value. Those interested in the complaint failed to sustain the burden that was on them to show a change. Our conclusion is that the respondent is entitled to the sum of $12,000 by way of going concern value, the amount fixed by the commission in the previous contest.

Depreciation: There is a substantial relation between accrued and annual depreciation for undoubtedly the experience of the particular utility in the past is an important element to be considered in estimating future depreciation. We will therefore consider these two items at one time. The respondent conceded an accrued depreciation of $8,935 during twenty-six years, the average time the property had been used, as a proper deduction from reproduction cost new in determining present value. Its witnesses depended on the observed method in determining accrued depreciation but ignored the actual experience of the company when they fixed annual depreciation at $2,000 on a straight line basis. The witness called by the commission fixed accrued depreciation at $44,931 and testified that an annual depreciation should be allowed of one per cent upon reproduction cost new less real estate, material and supplies and cash working capital, likewise employing the straight line method. The opposing witnesses were in agreement that they, as individuals, and the engineering profession generally preferred the straight line method of computation to the sinking fund method. The commission ignored the opinions of the experts on both sides and adopted the four per cent sinking fund method of computing both accrued and annual depreciation, fixing accrued depreciation at $6,504 and annual depreciation at $407.

While we agree with the commission to the extent that there is a substantial relation between accrued and annual depreciation, we cannot assent to the proposition that they must be calculated at the same rate or by the same method. Allowance for depreciation is not confined to the amount of disintegration or wearing out of the property (not covered by ordinary maintenance and repairs and so provided for), but should also comprehend functional depreciation due to obsolescence and

inadequacy. Although these two elements overlap ordinarily, inadequacy may result from changes in financial policy, engineering progress, advancement in the arts, and unexpected developments. Obsolescence may result from a change in demand rather than a change in type and quality of the facilities. An illustration is the substitution of automobile transportation for older forms of conveyance. While wear and tear may increase during the life of the property in a reasonable definite ratio, this is not true of obsolescence or inadequacy. Machinery may become obsolete or inadequate at any time within the life of the physical property by reason of new developments, or more specifically a sewer plant might suffer from a sudden shift in population or other causes which cannot be foreseen or definitely predicted.

While the straight line method and the sinking fund method have both been employed in determining the amount of depreciation to be allowed in rate cases, we have never said and we do not believe that it has been authoritatively stated anywhere that either of these methods furnish an absolute formula for its determination, even when in the case of annual depreciation the life of the property has been determined and certainly not in considering accrued depreciation. These methods' are to be employed as aids, tests and guides rather than as absolute measures.

Accrued Depreciation: For the time being we will confine our attention to the subject of accrued depreciation as affecting the property under consideration. We believe the commission committed a fundamental error in fixing accrued depreciation solely by the sinking fund method. When a new rate hearing is held, fair value is fixed as of the time that the order is made: Wilcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192; McCardle v. Indianapolis Co., 272 U. S. 400, 409, 47 S.

Ct. 144; Chambersburg Gas Co. v. P. S. C., 116 Pa. Superior Ct. 196, 176 A. 794. If too much or too little depreciation was previously allowed or taken the utility gains or suffers, but it is not a matter for consideration in fixing future rates. More specifically, interest is not to be taken into account which is the fundamental difference between the straight line method and the sinking fund method.

While actual observation is to be preferred to theory in determining the amount of depreciation that has taken place, there is in the early life of any article latent depreciation that must have taken place but cannot be readily seen or detected. It therefore becomes necessary to depend upon the advice of experts, drawn from their larger experience and learned from a study of numerous cases, for information as to such a condition. The respondent's expert undertook to testify after actual observation, an examination of the plant by means of excavations and with the assistance of light thrown through manholes in the case of buried lines. The expert called by the commission depended almost exclusively upon theory for his conclusions. At the same time the weight of the testimony of the respondent's engineer was seriously affected by the fact that he disclosed that in arriving at his conclusions he assumed repairs necessary to be made in restoring the plant which were nothing more than items of maintenance and repair for which the utility was normally compensated. The engineer called by the commission qualified rather as an accountant than as an engineer for such experience as he disclosed had to do largely with utilities of a different type than the one under consideration with the result that his testimony was far from convincing.

Giving weight to the evidence obtained by observation as to the actual physical condition of the plant

and taking into account all of the evidence as to all forms of depreciation and the principles to which we have referred we are convinced that the estimate of the commission was too low. Our independent judgment is that the sum of $13,500 should be deducted for accrued depreciation.

Annual Depreciation: In arriving at an allowance for annual depreciation the commission adopted the sinking fund method. The evidence of all the experts in this case is to the effect that the straight line method is preferred by accountants and engineers. When the sinking fund plan is followed, it is necessary to assume a value for two quantities, the life of the plant and rate of interest. The commission assumed 100 years, of which 26 had expired, as the life of the plant, and adopting 4% as the rate of interest, fixed the annual allowance at $407, sums which accumulated and compounded annually for 74 years will produce a sum equivalent to the present fair value of the plant[1]. All other considerations were eliminated by this method. Use has frequently been made of the sinking fund method, by our commission and other similar bodies in determining the proper allowance for depreciation and we have approved its use in some cases. It does not, however, furnish an absolute formula which may be adopted without consideration of other conditions which may affect its accuracy.

There are some features of depreciation allowance that are peculiar to rate cases and do not apply to other business enterprises. When a rate for a utility is determined it remains fixed until a new investigation is made or a new tariff filed and appropriate orders made. Nevertheless, the property is constantly depreciating in

[1] The formula is $x = \dfrac{v(r-1)}{r^n - 1}$ where $r = 1 +$ the interest rate expressed decimally, and $n =$ the assumed life of the plant.

value, but notwithstanding such depreciation and the fact that the utility is only entitled to its then value as a basis of return, it continues to receive a return on the full value. For such period the sinking fund method properly applied is more accurate than the straight line method for the total return is more nearly the amount to which the utility is entitled. In the case of the straight line method, the utility continues to receive a return on capital which has been returned to it. On the other hand, if the sinking fund method is employed and there is a new hearing with a reappraisement, the rate base is reduced by the accrued depreciation with a necessary loss of income to the utility for property not used or useful as a public utility is not included in the rate base and the investor receives no interest return for the use of the portion of his money in the sinking fund but only a return of capital. In short, if there are frequent reappraisements of the property, the full value of the property will not be returned and the integrity of the investment will not be preserved. The justification for the use of the sinking fund method is to offset the advantage which the company receives by getting a return on a base to which it is not entitled. In making a proper adjustment, it is fitting to take into account the matter of interest.

If the life of a plant and rate of interest could be predicted with reasonable certainty, an injustice might arise in the use of the sinking fund method by reason of the fact that depreciation, and particularly the aspect of it which we describe as obsolescence and inadequacy, is not distributed evenly during the life of a plant. When interest is compounded the return by reason of interest is much larger in the late history of the plant. Our conclusion is that in the case of the utility we are examining the adoption of the sinking fund method and the basing of the allowance upon a

theoretical life of 74 years and a rate of interest of 4%, divorced of all other considerations is not a fair method. It is, however, a valuable guide in determining what is a fair allowance.

If we assume the method to be a proper one it would still be necessary to determine whether the life of the plant and rate of interest are justified by the evidence. 100 years is a long time to assume as the useful life of a sewerage plant and we do not believe that such assumption is justified by the facts. The reasoning employed by the commission indicates that in fixing that period of life it relied largely on the fact that vitrified terra cotta pipe when buried is not subject to disintegration, decay or rust for a long period, even longer than 100 years. Even admitting that the pipe itself would remain serviceable for that period there remains the liability of the joints to disintegration or the breaking of the joints, for example by roots of trees working through them into the pipe. The evidence indicates that the lines, even when properly laid, are subject to non-recurring injuries such as subsidence, floods and washouts which are not compensated for by the small amount allowed for maintenance and repair and cannot properly be predicted so as to be so provided for. More important, it does not give due weight to obsolescence and inadequacy. Because we cannot predict with accuracy in just what manner or when the plant will become obsolete or inadequate is not sufficient reason for rejecting such claim when common prudence demands and business experience demonstrates that allowance must be made for such matters or the results will be disastrous to stockholders and other investors. When a fair return is fixed it assumes that there will be a proper allowance made so that the integrity of the investment will be preserved. We think the evidence warrants the conclusions that investors could not be found who on the

assumption of a 6% or 7% annual return would hazard their capital subject to the risk that it would be returned by the payment of less than $\frac{1}{4}$ of 1% of the investment each year.

When the commission fixed 4% as the rate of interest which is to be compounded annually, it did so without any evidence to support such finding. We find no evidence in the record that would warrant the conclusion that $407 could be promptly invested at the end of each year at the rate of 4%. Under the method employed by the commission the stockholders have a right to demand that the fund should be invested in high grade securities. Bank interest as fixed by the federal reserve board is now considerably less than the amount named and federal, state and municipal bonds are selling at a less rate. The difference becomes of great importance when it enters into the computation of compound interest. The total accumulated fund computed on a compound interest basis does not increase in direct proportion to the rate of interest[1]. It will readily be seen that the fixing of a rate which is too high is a matter of serious moment. In addition the commission entirely overlooked the state taxes that would be required to be paid. Any such errors are increased in a geometrical ratio by the use of an incorrect rate of interest for the fund.

A careful consideration of all the evidence including the experiences of the company, the amount of accrued depreciation, and making a proper allowance for interest, leads us to the conclusion as a matter of independent judgment that the sum of $1,540 annually would be fair, just and reasonable.

We summarize our conclusions as to fair value as follows:

---

[1] $1 compounded annually for 75 years at 2% amounts to $4.41 plus; at 4% to $18.94 plus. Using the same number of years, if the fund is computed on a 2% basis, the annual allowance would be increased in the ratio of 5855 to 2229.

| | |
|---|---:|
| Reproduction Cost New, Physical property | $171,264 |
| Organization, Engineering, etc. .......... | 21,237 |
| Material and Supplies .................. | 50 |
| Working Capital ...................... | 2,500 |
| Cost of Financing ..................... | 4,250 |
| | $199,301 |
| Going Concern Value ................... | 12,000 |
| | $211,301 |
| Accrued Depreciation .................. | 13,500 |
| Fair Value ........................... | $197,801 |

### OPERATING EXPENSES.

The appellant also complains of certain amounts fixed by the commission in determining the gross annual revenue which the utility is entitled to collect from its customers. The items excepted to are comprehended under the sub-divisions of operating expenses and taxes. There are certain general observations that concern each of the disputed amounts to which we will refer at this time. "Good faith is to be presumed on the part of the managers of a business......In the absence of a showing of inefficiency or improvidence, the court will not substitute its judgment for theirs as to the measure of a prudent outlay": West Ohio Gas Co. v. P. U. C., 294 U. S. 63, 72, 55 S. Ct. 316, 321. Among those drawing salaries as officers, managers and clerks are a number of the members of the family of William T. B. Roberts, the owner of practically all of the stock of the company. We agree with the conclusion of the commission that the sums paid to the various members of that family are out of proportion to the useful service required. The work essential to a proper operation of the utility could be performed efficiently, we are convinced, by a less number of persons by a different division of the work. The record also discloses that several of these

employees were engaged in other business activities in which the Roberts family were interested and the respondent has failed to furnish sufficient satisfactory evidence segregating the work actually performed for the benefit of the utility. We do not regard this practice as a case of purposely swelling the payroll for the purpose of substantiating a claim for larger operating expenses, but rather as an effort upon the part of the owner to provide employment for members of his family. For this reason we do not believe that it should affect other matters but if such practice is continued the compensation paid for unnecessary employees cannot be passed on to the public. We will consider the objections raised under the same classifications as were adopted by the commission and the parties.

Maintenance and Operating Labor: Under this title the respondent claimed an annual allowance of $3,150 and the commission allowed $1,350. The amount claimed is made up to a large extent by wages paid to C. H. B. Roberts and Michael Mullen. While considerable supervisory service is rendered by Mr. Roberts, we are convinced after a careful reading of all the testimony that a different distribution of work such as would be adopted by a prudent business concern economically and efficiently operated would enable this work to be done at a considerable saving. We believe the commission reached a correct conclusion on this item and if such is not the case it is the fault of the respondent who should have presented a more detailed account of the work and labor done and furnished or other proper proof of necessity for the same.

Maintenance of System: The commission in fixing an amount of $146 for this item considered the experience of the utility for several years and reached an average rather than relying on a single year as was urged by the respondent. Our independent judgment is in accord with that of the commission.

Salaries of Officers: The respondent claimed as proper salaries for its officers the sum of $3,500 of which $2,000 was assigned to the president and $1,500 to the secretary. The commission allowed $300 for the president and $1,200 for the secretary. The evidence furnishes us a good picture of the work required and performed by these executives and we believe the conclusion of the commission is fair and just. The president is 85 years of age and devotes little of his time to the office and has other enterprises that share his attention. The record so far as it discloses the actual work done by the secretary as an officer would not support an allowance as large as that fixed. The burdens of the executive officers of this utility are comparatively light and in agreeing to this item we assume that it is intended to cover clerical and other service that is not strictly of an executive character.

Salaries of Office Clerks: Respondent claimed on this account the annual sum of $3,250, substantially the amount paid for the previous five years and the commission allowed $1,800. The claim covers roughly $1,300 each for F. H. Roberts, Jr. and Mrs. E. C. Miller and $650 for W. S. Natress. The evidence as to the work performed by Natress warrants us in dismissing any claim on that account. On the other hand, Mrs. Miller devotes all of her time to the service of the company and the amount allowed her is not shown to be unreasonable and should therefore be approved. This leaves for consideration what amount should be allowed for account of the services that have been performed by F. H. Roberts, Jr. While the amount allowed by the commission taken with other items was ample to cover actual office service performed under this head, there is considerable evidence showing the outside work required to be done in the efficient management of the plant such as inspection of lines and covering the territory of the company to see that unauthorized connections are not made,

checking the use made of facilities as affected by changes in use by customers, collecting delinquent bills, etc. This work has been divided among the members of the Roberts family with the result that unnecessary expenses have been incurred but we feel that in a rearrangement of this work there would be more service required than has been covered by all the items allowed by the commission. We feel that an allowance should be made of $1,000 per year to cover the work required to be done. We have taken into account the fact that some of these employees, members of the Roberts family, are concerned in other activities. Our judgment is that a total annual allowance of $2,300 should be made.

Office Supplies and Expenses: This item like several we have considered involves a pure question of fact that does not call for extended discussion. The commission allowed a total of $1,275 which covered $900 for rent, $250 for specialized accounting service and $125 for office supplies and expenses. The weight of the evidence sustains the findings of the commission as to rents and expenses. The claim for specialized accounting service is intended to cover matters arising in connection with informal conferences and hearings before the public service commission and matters involving income tax reports and contests. We do not agree with the conclusion of the commission that the history of expenses incident to informal conferences with the commission and hearings should be entirely disregarded and nothing allowed on that account. While a utility may not pass on to its customers the expenses incident to an attempt to collect from the public unreasonable charges, a portion at least of the charges heretofore paid are not of that nature. Some of the expenses were legitimate and the evidence in its entirety in our opinion warrants a finding that the company will in all probability be called upon to make legitimate expenditures on this account. The commission did allow $25 under a separate head.

Taking all the evidence into consideration our independent judgment is that $100 should be added to the amount allowed by the commission making a total of $1,375, and that the separate item of $25 for public service commission expense should remain as it is.

Legal Expenses: The amount allowed for legal expenses involves a pure question of fact, and we are in accord with the conclusion of the commission.

We summarize our conclusions as to operating expenses including the items that are not contested as follows:

| | |
|---|---:|
| Maintenance and Operating Labor | $1,350 |
| Maintenance of System | 146 |
| Miscellaneous Supplies and Expenses | 300 |
| Disposal Rent | 7,725 |
| Salaries of Officers | 1,500 |
| Salaries of Office Clerks | 2,300 |
| Office Supplies and Expenses | 1,375 |
| Legal Expenses | 100 |
| Public Service Commission Expense | 25 |
| Bad Debts | 300 |
| Taxes other than Federal and State Income Tax | 388 |
| Other General Expense | 50 |
| Operating Expenses | $15,559 |

Taxes: The commission allowed $388 annually for federal and state capital stock taxes, $773 for federal income tax and $310 for state income tax. The appellant makes the complaint that in estimating income taxes there was deducted from gross revenue interest paid on the entire $100,000 bond issue. The commission was correct; the bonds represent an indebtedness of the company. It does not make any difference in calculating the amount of a tax payable whether the proceeds were used in the purchase of the storm or sanitary sewer system. The use to which the proceeds of the bond issue were devoted was a proper matter for

consideration in estimating brokerage fees and there is no inconsistency in so doing. The fixing of a just sum is complicated by the present trend toward increased taxes, both federal and state, upon the income of corporations. We have nothing sufficiently definite at this time to warrant us in disturbing the finding of the commission.

We have confined our attention to such matters as are contested.

We summarize our conclusions as follows:

| | |
|---|---:|
| Return | $11,868 |
| Annual Depreciation | 1,540 |
| Operating Expense (Exclusive of federal and state income tax) | 15,559 |
| Income Taxes | 1,083 |
| Allowable Gross Revenue | $30,050 |

The order of the Public Service Commission is reversed and the record is remitted to the commission with directions to reform the findings, valuations and rates in accordance with this opinion.